836 F.2d 103
 56 USLW 2402
 Gerda Dorothea DeWEERTH, Plaintiff-Appellee,
v.
Edith Marks BALDINGER, Defendant-Third-Party-Plaintiff-Appellant,
v.
WILDENSTEIN & CO., INC., Third-Party-Defendant-Appellant.
 Nos. 165, 296, Dockets 87-7392, 87-7402.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 26, 1987.
Decided Dec. 30, 1987.
 
 Leslie Gordon Fagen, New York City (Edward M. Sills, Paul, Weiss, Rifkind, Wharton & Garrison, New York City on the brief), for defendant-third-party-plaintiff-appellant.
 Jeremy G. Epstein, New York City (Charles M. Lizza, Kenneth A. Freeling, Robert Y. Lewis, Shearman & Sterling, New York City on the brief), for third-party-defendant-appellant.
 Joseph D. Becker, New York City (Fox & Horan, Becker Glynn & Melamed, New York City on the brief), for plaintiff-appellee.
 Before FEINBERG, Chief Judge, NEWMAN and WINTER, Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 This appeal concerns a dispute over ownership of a painting by Claude Monet that disappeared from Germany at the end of World War II and has been in the possession of a good-faith purchaser for the last 30 years. The appeal presents primarily the issue whether New York law, which governs this dispute, requires an individual claiming ownership of stolen personal property to use due diligence in trying to locate the property in order to postpone the running of the statute of limitations in a suit against a good-faith purchaser. The issue arises on an appeal from a judgment of the District Court for the Southern District of New York (Vincent L. Broderick, Judge) ruling that plaintiff-appellee Gerda Dorothea DeWeerth, a citizen of West Germany who owned the Monet from 1922 until 1943, was entitled to recover it from defendant-appellant Edith Marks Baldinger, an American citizen who purchased the painting in New York in 1957 and who has possessed it ever since. We conclude that New York law imposes a due diligence requirement, that the undisputed facts show that DeWeerth failed to exercise reasonable diligence in locating the painting after its disappearance, and that her action for recovery is untimely. We therefore reverse the judgment of the District Court.
 
 Background
 
 2
 Claude Monet is, perhaps, the most well-known and widely admired member of the school of impressionist painters active in France in the late nineteenth and early twentieth centuries. It was his early work, "Impression: Sunrise, Le Havre" (1872) from which the term "impressionism" was coined. His later works, including the depictions of haystacks, poplars, and the gardens at Giverny remain paragons of the impressionist style and reflect Monet's unsurpassed ability to capture on canvas the dazzling and magical play of light on the natural world.
 
 
 3
 The painting in the pending case, Monet's "Champs de Ble a Vetheuil," is one of a series of similar impressionistic landscapes painted by the artist near the town of Vetheuil, located on the Seine in Northern France. The oil painting, measuring 65 by 81 centimeters, shows a wheat field, a village, and trees. It is signed and dated "Claude Monet '79." The painting is estimated to be worth in excess of $500,000.
 
 
 4
 Plaintiff Gerda Dorothea DeWeerth is a citizen of West Germany. Her father, Karl von der Heydt, the owner of a substantial art collection, purchased the Monet in 1908. DeWeerth inherited the painting in 1922 along with other works of art from her father's estate. She kept the painting in her home in Wuppertal-Elberfeld, Germany, from 1922 until 1943, except for the two-year period 1927-1929 when the Monet was in the possession of her mother. A photograph taken in 1943 shows the Monet hanging on a wall in DeWeerth's residence.
 
 
 5
 In August 1943, DeWeerth sent the Monet and other valuables to the home of her sister, Gisela von Palm, for safekeeping during World War II. Von Palm lived in a castle in Oberbalzheim, Southern Germany. Von Palm received the shipment, including the Monet, which she hung in the castle. In 1945, at the end of the war, American soldiers were quartered in von Palm's residence. Following the soldiers' departure, von Palm noticed that the Monet was missing. She informed her sister of the painting's disappearance in the fall of 1945.[1]
 
 
 6
 DeWeerth contacted several authorities concerning the lost Monet. In 1946, she filed a report with the military government administering the Bonn-Cologne area after the war. The report is no longer extant, but DeWeerth testified that it was a standard government form in which she briefly described items she had lost during the war. In 1948, in a letter to her lawyer, Dr. Heinz Frowein, regarding insurance claims on property she had lost, DeWeerth expressed regret about the missing Monet and inquired whether it was "possible to do anything about it." Frowein wrote back that the Monet would not be covered by insurance; he did not initiate an investigation. In 1955, DeWeerth sent the 1943 photograph of the Monet to Dr. Alfred Stange, a former professor of art and an expert in medieval painting, and asked him to investigate the painting's whereabouts. Stange responded that the photo was insufficient evidence with which to begin a search, and DeWeerth did not pursue the matter with him further. Finally, in 1957 DeWeerth sent a list of art works she had lost during the war to the Bundeskriminalamt, the West German federal bureau of investigation. None of DeWeerth's efforts during the period 1945-1957 to locate the Monet was fruitful. DeWeerth made no further attempts to recover the painting after 1957.
 
 
 7
 In the meantime, the Monet had reappeared in the international art market by 1956. In December of that year, third-party defendant-appellant Wildenstein & Co., Inc., an art gallery in New York City, acquired the Monet on consignment from Francois Reichenbach, an art dealer in Geneva, Switzerland. From December 1956 until June 1957, the painting was in the possession of Wildenstein in New York, where it was shown to several prospective buyers. Defendant Edith Marks Baldinger eventually purchased the painting in June 1957 for $30,900. The parties have stipulated that Baldinger purchased for value, in good faith, and without knowledge of any adverse claim.
 
 
 8
 Since 1957, Baldinger has kept the Monet in her New York City apartment, except for two occasions when it was displayed at public exhibitions. From October 29 to November 1, 1957, it was shown at a benefit at the Waldorf-Astoria Hotel, and in 1970 it was loaned to Wildenstein for an exhibition in its New York gallery for approximately one month.
 
 
 9
 DeWeerth learned of Baldinger's possession of the Monet through the efforts of her nephew, Peter von der Heydt. In 1981, von der Heydt was told by a cousin that DeWeerth had owned a Monet that had disappeared during the war. Shortly thereafter, von der Heydt identified the painting in a published volume of Monet's works, Claude Monet: Bibliographie et Catalogue Raisonne, Vol. I 1840-1881 (intro. by Daniel Wildenstein, La Bibliotheque des Arts, Lausanne and Paris, 1974), which he found at the Wallraf-Richartz Museum in Cologne, less than 20 miles from where DeWeerth has been living since 1957. The Catalogue Raisonne indicated that the painting had been sold by Wildenstein in 1957 and that Wildenstein had exhibited it in 1970. In 1982, DeWeerth retained counsel in New York and requested Wildenstein to identify the current owner. When Wildenstein refused, DeWeerth brought an action in New York Supreme Court under N.Y.Civ.Prac.L. & R. Sec. 3102(c) (McKinney 1970) for "disclosure to aid in bringing an action." In December 1982, the court ruled in favor of DeWeerth, and Wildenstein was compelled to identify Baldinger. By letter dated December 27, 1982, DeWeerth demanded return of the Monet from Baldinger. By letter dated February 1, 1983, Baldinger rejected the demand.
 
 
 10
 DeWeerth instituted the present action to recover the Monet on February 16, 1983.[2] At the conclusion of discovery, the parties submitted the case to Judge Broderick for decision on the record. The District Court adjudged DeWeerth the owner of the painting and ordered Baldinger to return it. The District Judge found that DeWeerth had superior title and that the action was timely as she had exercised reasonable diligence in finding the painting. DeWeerth v. Baldinger, 658 F.Supp. 688 (S.D.N.Y.1987).
 
 Discussion
 
 11
 In this diversity action, we must apply the substantive law of New York, including the applicable New York choice of law rules. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under New York law, actions that accrue within the State are governed by the local statute of limitations, while actions that accrue outside the State may be subject, pursuant to New York's "borrowing" statute, to the foreign jurisdiction's limitations provisions. See Martin v. Julius Dierck Equipment Co., 43 N.Y.2d 583, 588-89, 403 N.Y.S.2d 185, 187, 374 N.E.2d 97, 99 (1978); N.Y.Civ.Prac.L. & R. Sec. 202 (McKinney 1972). However, actions that accrue outside the State are subject to a borrowed limitations period only if it is shorter than New York's. See N.Y.Civ.Prac.L. & R. Sec. 202 & practice commentary 202:3 (McKinney 1972). In the present case, if DeWeerth's action is time-barred under New York's limitations law, then the action is untimely regardless of whether it accrued in New York or Germany.
 
 
 12
 The New York statute of limitations governing actions for recovery of stolen property requires that suit be brought within three years of the time the action accrued. N.Y.Civ.Prac.L. & R. Sec. 214(3) (McKinney 1972). The date of accrual depends upon the identity of the party from whom recovery is sought. Where an owner pursues the party who took his property, the three-year period begins to run when the property was taken. See Sporn v. M.C.A. Records, Inc., 58 N.Y.2d 482, 487-88, 462 N.Y.S.2d 413, 415-16, 448 N.E.2d 1324, 1326-27 (1983). This is so even where the property owner was unaware of the unlawful taking at the time it occurred. See Varga v. Credit-Suisse, 5 A.D.2d 289, 291-92, 171 N.Y.S.2d 674, 677-78 (1st Dep't), aff'd, 5 N.Y.2d 865, 182 N.Y.S.2d 17, 155 N.E.2d 865 (1958); Two Clinton Square Corp. v. Friedler, 91 A.D.2d 1193, 1194, 459 N.Y.S.2d 179, 181 (4th Dep't 1983). In contrast, where the owner proceeds against one who innocently purchases the property in good faith, the limitations period begins to run only when the owner demands return of the property and the purchaser refuses. Menzel v. List, 22 A.D.2d 647, 253 N.Y.S.2d 43, 44 (1st Dep't 1964), on remand, 49 Misc.2d 300, 267 N.Y.S.2d 804 (Sup.Ct.1966), modified on other grounds, 28 A.D.2d 516, 279 N.Y.S.2d 608 (1st Dep't 1967), modification rev'd, 24 N.Y.2d 91, 298 N.Y.S.2d 979, 246 N.E.2d 742 (1969); Duryea v. Andrews, 12 N.Y.S. 42 (2d Dep't 1890); accord Kunstsammlungen Zu Weimar v. Elicofon, 536 F.Supp. 829, 848-49 (E.D.N.Y.1981) (applying New York law), aff'd, 678 F.2d 1150, 1161 (2d Cir.1982). Until demand and refusal, the purchaser in good faith is not considered a wrongdoer, Gillet v. Roberts, 57 N.Y. 28 (1874), even though this rule somewhat anomalously affords the owner more time to sue a goodfaith purchaser than a thief.[3]
 
 
 13
 In the present case, it is undisputed that DeWeerth initiated her suit within three years of the date her demand for return of the Monet was refused. However, the fact that her action was brought soon after refusal does not end the inquiry. Under New York law, even though the three-year limitations period begins to run only once a demand for return of the property is refused, a plaintiff may not delay the action simply by postponing his demand. Where demand and refusal are necessary to start a limitations period, the demand may not be unreasonably delayed.[4] See Heide v. Glidden Buick Corp., 188 Misc. 198, 67 N.Y.S.2d 905 (1st Dep't 1947) (contract action); Austin v. Board of Higher Education, 5 N.Y.2d 430, 442-43, 186 N.Y.S.2d 1, 10-11, 158 N.E.2d 681, 687-88 (1959) (mandamus proceeding); Reid v. Board of Supervisors, 128 N.Y. 364, 373, 28 N.E. 367, 369 (1891) (reimbursement for price of real estate purchased at tax sale); Kunstsammlungen Zu Weimar v. Elicofon, supra, 536 F.Supp. at 849 (recovery of stolen art). While this proscription against unreasonable delay has been referred to as "laches," the New York courts have explained that the doctrine refers solely to an unexcused lapse of time and not to the equitable principle of laches, which requires prejudice to the defendant as well as delay. See Devens v. Gokey, 12 A.D.2d 135, 137, 209 N.Y.S.2d 94, 97 (4th Dep't), aff'd, 10 N.Y.2d 898, 223 N.Y.S.2d 515, 179 N.E.2d 516 (1961); Curtis v. Board of Education, 107 A.D.2d 445, 448, 487 N.Y.S.2d 439, 441 (4th Dep't 1985).
 
 
 14
 Baldinger asserts that DeWeerth's action is untimely because the delay between the painting's disappearance in Europe in 1945 and DeWeerth's demand for its return in 1982 was unreasonable. DeWeerth responds that she cannot be charged with unreasonable delay before learning the identity of Baldinger in 1982 because she could not have known before that time to whom to make the demand. These contentions frame the precise issue presented by this appeal: Whether New York law imposes upon a person who claims ownership of stolen personal property an obligation to use due diligence in attempting to locate the property. DeWeerth points out that no New York court has ever held that the unreasonable delay rule applies before the plaintiff has learned the identity of the person to whom demand must be made. In Glidden Buick, Reid, and Austin, plaintiffs were barred for unreasonably delaying demands to known defendants. DeWeerth suggests that in the absence of New York authority directly on point, her actions before she discovered that Baldinger possessed the Monet cannot be subject to the unreasonable delay rule. Baldinger responds that New York courts, confronting the issue, would impose an obligation of due diligence to attempt to locate the person in possession of another's property. The District Court did not decide the issue, concluding that plaintiff had exercised due diligence in any event. 658 F.Supp. at 694.
 
 
 15
 This Court's role in exercising its diversity jurisdiction is to sit as another court of the state. Guaranty Trust Co. v. York, 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945). When presented with an absence of controlling state authority, we must "make an estimate of what the state's highest court would rule to be its law." Stafford v. International Harvester Co., 668 F.2d 142, 148 (2d Cir.1981) (quoting Bailey Employment System, Inc. v. Hahn, 655 F.2d 473, 477 (2d Cir.1981)). In making that determination, this Court may consider all of the resources that the New York Court of Appeals could use, see Francis v. INA Life Insurance Co., 809 F.2d 183, 185 (2d Cir.1987), including New York's stated policies and the law of other jurisdictions. We determine that in an action for the recovery of stolen personal property, the New York Court of Appeals would not make an exception to the unreasonable delay rule for plaintiff's actions prior to learning the identity of the current possessor. Rather, we believe that the New York courts would impose a duty of reasonable diligence in attempting to locate stolen property, in addition to the undisputed duty to make a demand for return within a reasonable time after the current possessor is identified.[5]
 
 
 16
 An obligation to attempt to locate stolen property is consistent with New York's treatment of the good-faith purchaser. The purpose of the rule whereby demand and refusal are substantive elements of a conversion action against a good-faith purchaser is to protect the innocent party by assuring him notice before he is held liable in tort:
 
 
 17
 The rule is a reasonable and just one, that an innocent purchaser of personal property from a wrong-doer shall first be informed of the defect in his title and have an opportunity to deliver the property to the true owner, before he shall be made liable as a tort-feasor for a wrongful conversion.
 
 
 18
 Gillet v. Roberts, supra, 57 N.Y. at 34; accord Kunstsammlungen Zu Weimar v. Elicofon, supra, 536 F.Supp. at 848. The rule may disadvantage the good-faith purchaser, however, if demand can be indefinitely postponed. For if demand is delayed, then so is accrual of the cause of action, and the good-faith purchaser will remain exposed to suit long after an action against a thief or even other innocent parties would be time-barred. See, e.g., Varga v. Credit-Suisse, supra, 5 A.D.2d at 291, 171 N.Y.S.2d at 677-78 (action against converter accrues when property is taken); Federal Insurance Co. v. Fries, 78 Misc.2d 805, 810, 355 N.Y.S.2d 741, 747 (Civ.Ct.1974) (action against recipient of mistaken delivery accrues at time of delivery). As the court in Elicofon observed, the unreasonable delay rule serves to mitigate the inequity of favoring a thief over a good-faith purchaser. 536 F.Supp. at 849. In this case, plaintiff's proposed exception to the rule would rob it of all of its salutary effect: The thief would be immune from suit after three years, while the good-faith purchaser would remain exposed as long as his identity did not fortuitously come to the property owner's attention. A construction of the rule requiring due diligence in making a demand to include an obligation to make a reasonable effort to locate the property will prevent unnecessary hardship to the good-faith purchaser, the party intended to be protected.
 
 
 19
 New York law governing limitations of actions also weighs in favor of a duty to attempt to locate stolen property. The New York Court of Appeals has said that
 
 
 20
 the primary purpose of a limitations period is fairness to a defendant (Flanagan v. Mount Eden Gen. Hosp., 24 N.Y.2d 427, 429, 301 N.Y.S.2d 23, 248 N.E.2d 871). A defendant should " 'be secure in his reasonable expectation that the slate has been wiped clean of ancient obligations, and he ought not to be called on to resist a claim where the "evidence has been lost, memories have faded, and witnesses have disappeared" ' " (id., quoting Developments in the Law: Statutes of Limitations, 63 Harv.L.Rev. 1177, 1185). There is also the need to protect the judicial system from the burden of adjudicating stale and groundless claims.
 
 
 21
 Duffy v. Horton Memorial Hospital, 66 N.Y.2d 473, 476-77, 497 N.Y.S.2d 890, 892-93, 488 N.E.2d 820, 822-23 (1985) (citation omitted). These policies would be frustrated if plaintiffs were free to delay actions for the return of stolen property until the property's location fortuitously came to their attention. Conceivably, those claiming to be owners, or their heirs, could wait idly for decades or even centuries before any legal obligation arose to pursue their claims. In such cases, all of the problems of lost evidence, faded memories, and unavailable witnesses would undoubtedly be exacerbated. Additionally, fraudulent and groundless claims would be encouraged as defendants would face a heavy burden of refuting proffered testimony related to events of the distant past.
 
 
 22
 A rule requiring reasonable diligence in attempting to locate stolen property is especially appropriate with respect to stolen art. Much art is kept in private collections, unadvertised and unavailable to the public. An owner seeking to recover such property will almost never learn of its whereabouts by chance. Yet the location of stolen art may frequently be discovered through investigation. See F. Feldman & B. Burnham, An Art Archive: Principles and Realization, 10 Conn.L.Rev. 702, 724 (1978) (French and Italian authorities credit stolen art registries and investigation efforts for recovery rates as high as 75%). Unlike many other items of stolen personal property, such as jewelry or automobiles, art loses its value if it is altered or disguised. Moreover, valuable works of art, unlike fungible items like stereo components, tend to be easily remembered by those who have seen them. Thus, the owner of stolen art has a better chance than most owners of stolen property in tracking down the item he has lost.
 
 
 23
 Other jurisdictions have adopted limitations rules that encourage property owners to search for their missing goods. In virtually every state except New York, an action for conversion accrues when a good-faith purchaser acquires stolen property; demand and refusal are unnecessary. See Restatement (Second) of Torts Sec. 229 & comment h (1965); Prosser, Law of Torts 93-94 (5th ed. 1984); 51 Am.Jur.2d Limitation of Actions Sec. 125; Federal Insurance Co. v. Fries, supra, 78 Misc.2d at 807, 355 N.Y.S.2d at 744. In these states, the owner must find the current possessor within the statutory period or his action is barred. Obviously, this creates an incentive to find one's stolen property. It is true that New York has chosen to depart from the majority view. Nevertheless, the fact that plaintiff's interpretation of New York law would exaggerate its inconsistency with the law of other jurisdictions weighs against adopting such a view. At least one other state has recently confronted the limitations problem in the context of stolen art and has imposed a duty of reasonable investigation. See O'Keefe v. Snyder, 83 N.J. 478, 416 A.2d 862 (1980); See also Comment, The Recovery of Stolen Art: Of Paintings, Statues and Statutes of Limitations, 27 U.C.L.A.L.Rev. 1122 (1980).
 
 
 24
 In light of New York's policy of favoring the good faith purchaser and discouraging stale claims and the approach to actions to recover property in other jurisdictions, we hold that under New York law an owner's obligation to make a demand without unreasonable delay includes an obligation to use due diligence to locate stolen property.
 
 
 25
 The District Court found that DeWeerth undertook the following efforts to locate the Monet after she learned of its disappearance in 1945:
 
 
 26
 In 1946 she reported the loss of the Monet to the military government then administering the Bonn-Cologne area after the end of the War. In 1948 she solicited the assistance of her lawyer, Dr. Heinz Frowein, in attempting to find and recover it. Plaintiff also made inquiries in 1955 of one Dr. Alfred Stange, known to Mrs. DeWeerth as an art expert. In 1957 she reported the Monet as missing to the Bundeskriminalamt (the West German federal bureau of investigation) in Bonn. All of these efforts to find the Monet were unsuccessful.
 
 
 27
 658 F.Supp. at 691. The District Court held that these efforts constituted due diligence and that DeWeerth's demand upon Baldinger in 1982 was not unreasonably delayed. Id. at 695.
 
 
 28
 Plaintiff asserts that the determination of the District Court may be reversed only if clearly erroneous. She bases this assertion on her characterization of the decision below as an application of the equitable defense of laches. See Esso International, Inc. v. S.S. Captain John, 443 F.2d 1144, 1150 (5th Cir.1971) (existence of laches is a question of fact subject to review under clearly erroneous standard); DeSilvio v. Prudential Lines, Inc., 701 F.2d 13, 15 (2d Cir.1983) (ruling on laches may be overturned only where trial court abused its discretion). Although Judge Broderick subsumed the laches issue into his discussion of the statute of limitations, 658 F.Supp. at 693 n. 7, the two issues are distinct. Laches is an equitable defense that requires a showing of delay and prejudice to the defendant, whereas the reasonably prompt demand principle involved in this case is a legal doctrine based exclusively on an unexcused lapse of time. See Devens v. Gokey, supra, 12 A.D.2d at 137, 209 N.Y.S.2d at 97. Where, as here, the issue is the application of a legal standard--"reasonable diligence"--to a set of facts, review is de novo. See Utica Mutual Ins. Co. v. Fireman's Fund Ins. Co., 748 F.2d 118, 122 & n. 3 (2d Cir.1984) (whether plaintiff's failure to discover a fraud was reasonable is a question of law subject to plenary review); Reid v. Board of Supervisors, supra, 128 N.Y. at 373, 28 N.E. at 369 ("What is a reasonable time [to make a demand that starts the limitations period] is a question of law....") (emphasis added).
 
 
 29
 The question of what constitutes unreasonable delay in making a demand that starts the statute of limitations depends upon the circumstances of the case. Id.; Kunstsammlungen Zu Weimar v. Elicofon, supra, 536 F.Supp. at 849. When the action is for the return of stolen property, one of the key circumstances is the nature and value of the property at issue. See O'Keefe v. Snyder, supra, 83 N.J. at 499, 416 A.2d at 873. It has been recognized that when the property is valuable art, the search efforts that may reasonably be expected of an owner may be more exacting than where the property is of a different kind or of a lesser value. Id.
 
 
 30
 In Elicofon, we considered the issue of what search efforts may reasonably be expected of a plaintiff seeking to recover stolen art. A German museum had sought the return of two paintings by Albrecht Durer that had disappeared from Germany in 1945 and had been discovered in Brooklyn in 1966. Among the issues presented was whether the plaintiff had exercised reasonable diligence in finding the paintings. The District Court held that plaintiff's search was reasonable, and this Court affirmed. 536 F.Supp. at 852, aff'd, 678 F.2d at 1164 n. 25, 1165. As described in the opinion of the District Court, the plaintiff's investigation "followed many channels" and "reflect[ed] a continuous and diligent search." 536 F.Supp. at 852. Specifically, the museum director informed numerous art museums and military agencies of the facts surrounding the theft. He contacted two German art museums, two American colleagues including the curator of Harvard's Germanic Museum, American military authorities, the Allied Control Council, and the Soviet Military Administration. Additionally, the loss of the Durers was made known to several organizations specifically set up to locate art stolen during the war. These included a program run by the United States Department of State as well as the Federal Republic of Germany Trust Administration, which had taken over a program begun in Europe by the allied forces. Finally, the loss of the Durers was reported in two publications listing stolen works of art. The paintings were eventually discovered in Brooklyn because a visitor to Elicofon's home recognized the Durers from one of these publications. 536 F.Supp. at 850-52.
 
 
 31
 In contrast with the "continuous and diligent search" following "many channels" in Elicofon, DeWeerth's investigation was minimal. The "reports" filed with the military government and the Bundeskriminalamt amounted to no more than a standard form listing personal items lost during the war and a one-sentence letter submitting a list of works "I lost during and after the war." Unlike the correspondence described in Elicofon, neither of these reports gave any details as to how, where, or when the Monet had disappeared, nor any other information that would be essential to a credible search. DeWeerth's contacts with the lawyer Frowein and the art expert Stange were no more meaningful. She wrote to Frowein regarding her insurance coverage. She mentioned that the Monet was among the art she had lost and inquired generally, "Is it possible to do anything about it?" It is not clear whether this was a request to find the painting or simply a question about insurance coverage. In any event, when Frowein wrote back that the Monet would not be covered by insurance, DeWeerth let the matter drop. DeWeerth did ask Stange to find the Monet. But, as with Frowein, the investigation never was started; Stange replied that he had insufficient information on which to proceed, and DeWeerth then abandoned the effort.
 
 
 32
 More revealing than the steps DeWeerth took to find the Monet are those she failed to take. Conspicuously absent from her attempts to locate the painting is any effort to take advantage of several mechanisms specifically set up to locate art lost during World War II. As described in Elicofon, one such mechanism was a program initiated by the allied forces in Europe to handle works of art looted during the war. Under this program, Central Collecting Points (CCPs) were established throughout Germany where works of art turned in to the occupying forces were catalogued and stored until claimed by their rightful owners. In 1949, administration of the program was transferred to the German government and the paintings then located in the CCPs were given to a Trust Administration of the Federal Republic of Germany. Another program was run by the United States Department of State, which engaged in its own independent effort to locate stolen art. Kunstsammlungen Zu Weimar v. Elicofon, supra, 536 F.Supp. at 850-51. In Elicofon, the plaintiff corresponded with the State Department and the Trust Administration and may have contacted the CCPs as well. DeWeerth, in contrast, informed none of these agencies about the Monet, although she was aware of the CCPs; her family had attempted to recover other art from them.[6]
 
 
 33
 Nor did DeWeerth publicize her loss of the Monet in any one of several available listings designed to keep museums, galleries, and collectors vigilant for stolen art. See id. at 851 (German publications); F. Feldman & B. Burnham, An Art Theft Archive: Principles and Realization, 10 Conn.L.Rev. 702, 703 n. 5, 706 n. 12 (1978) (American publications). As illustrated by Elicofon, where the painting was discovered via such a publication, this was a potentially fruitful channel of search.
 
 
 34
 Most indicative of DeWeerth's lack of diligence is her failure to conduct any search for 24 years from 1957 until 1981. Significantly, if DeWeerth had undertaken even the most minimal investigation during this period, she would very likely have discovered the Monet, since there were several published references to it in the art world. First, the Monet was pictured in the catalogues of two public exhibitions at which the painting was shown, One Hundred Years of Impressionism, A Tribute to Durand-Ruel, A Loan Exhibition, published in connection with an exhibition held from April 2 to May 9, 1970, at the Wildenstein Gallery in New York, and Festival of Art, published in connection with an exhibition held from October 29 to November 1, 1957, at the Waldorf-Astoria Hotel in New York. Second, the Monet was illustrated in a book by Daniel Wildenstein, Monet: Impressions, published in New York in 1967. Finally, the Monet is included in the comprehensive Catalogue Raisonne, supra. Consultation of any of these publications would likely have led DeWeerth to the Monet as each one is connected to the Wildenstein Gallery in New York, which sold the painting to Baldinger.
 
 
 35
 DeWeerth's failure to consult the Catalogue Raisonne is particularly inexcusable. A catalogue raisonne is a definitive listing and accounting of the works of an artist. The Monet Catalogue Raisonne depicts each of Monet's works in chronological order and sets forth each work's provenance--a history of its ownership, exhibitions in which it has been shown, and published references to it. The entry for painting number 595, the one here at issue, indicates that Wildenstein sold the painting in the United States in 1957 and that it was exhibited by Wildenstein in 1970. This entry could have easily directed DeWeerth to Wildenstein. Indeed, when in 1981 DeWeerth's nephew learned from a cousin of the lost Monet, he was able to identify it in the Catalogue Raisonne within three days, which led to the identification of Baldinger shortly thereafter.
 
 
 36
 The District Court excused DeWeerth's failure to search for the Monet after 1957 on the grounds that she was elderly during this period, that published references to the Monet were not generally circulated, and that as an individual she could not be expected to mount the sort of investigation undertaken by the government-owned art museum in Elicofon. 658 F.Supp. at 694-95. But in 1957, when DeWeerth made her last attempt to locate the painting, she was only 63 years old. Moreover, though the published references may not have been generally circulated, they were accessible to anyone looking for them as Peter von der Heydt's quick discovery in the Catalogue Raisonne makes clear. Finally, although an individual, DeWeerth appears to be a wealthy and sophisticated art collector; even if she could not have mounted a more extensive investigation herself, she could have retained someone to do it for her.
 
 
 37
 This case illustrates the problems associated with the prosecution of stale claims. Gisela von Palm, the only witness who could verify what happened to the Monet in 1945 is dead. Key documents, including DeWeerth's father's will and reports to the military authorities, are missing. DeWeerth's claim of superior title is supported largely by hearsay testimony of questionable value. Memories have faded. To require a good-faith purchaser who has owned a painting for 30 years to defend under these circumstances would be unjust. New York law avoids this injustice by requiring a property owner to use reasonable diligence in locating his property. In this case, DeWeerth failed to meet that burden. Accordingly, the judgment of the District Court is reversed.[7]
 
 
 
 [1]
 Von Palm died in June of 1983 without ever having given testimony in connection with this case. Her account of the Monet's disappearance was related in the District Court by Margarete Huber, von Palm's maid in 1945. The District Court admitted Huber's testimony under the excited utterance exception to the hearsay rule. DeWeerth v. Baldinger, 658 F.Supp. 688, 690 n. 2 (S.D.N.Y.1987). Our disposition of the appeal makes it unnecessary to decide whether this or some other exception to the hearsay rule applied to Huber's testimony
 
 
 [2]
 Baldinger brought a third-party action against Wildenstein. That action has been severed pursuant to Fed.R.Civ.P. 42(b)
 
 
 [3]
 N.Y.Civ.Prac.L. & R. Sec. 206(a) (McKinney 1972) provides that when a demand is necessary to entitle a person to commence an action, the action accrues at "the time when the right to make the demand is complete...." This section has been interpreted to mean that a right to demand converted property is complete when the defendant acquires the property, whether or not the plaintiff knows the facts that gave rise to the right. See Federal Insurance Co. v. Fries, 78 Misc.2d 805, 810, 355 N.Y.S.2d 741, 747 (Civ.Ct.1974); N.Y.Civ.Prac.L. & R. practice commentary 206:1 (McKinney 1972). However, section 206(a) applies only where the demand requirement is a procedural as opposed to a substantive element of the cause of action. Frigi-Griffin, Inc. v. Leeds, 52 A.D.2d 805, 806, 383 N.Y.S.2d 339, 341 (1st Dep't 1976). In Menzel v. List, supra, a case involving stolen art, the New York Appellate Division held that "with respect to a bona fide purchaser of personal property a demand by the rightful owner is a substantive, rather than a procedural, prerequisite to the bringing of an action for conversion by the owner." 22 A.D.2d at 647, 253 N.Y.S.2d at 44. Since, in the pending case, the defendant is a good-faith purchaser, the statute of limitations does not begin to run until demand and refusal actually occur. Id; see also Kunstsammlungen Zu Weimar v. Elicofon, supra, 678 F.2d at 1161-63 (section 206 does not apply to actions to recover property from a good-faith purchaser)
 
 
 [4]
 The proscription against unreasonably delaying a demand is distinct from N.Y.Civ.Prac.L. & R. Sec. 206(a) governing the accrual of actions requiring a demand. Section 206 specifies that the statutory limitations period, e.g., three years for conversion, starts as soon as the right to make a demand is complete, but this provision has been construed to apply only where the demand requirement is procedural. See Frigi-Griffin, Inc. v. Leeds, 52 A.D.2d 805, 806, 383 N.Y.S.2d 339, 341 (1st Dep't 1976). By contrast, the unreasonable delay rule, applicable to this case as a substantive requirement, specifies that whenever a demand would be required to start the limitations period, that demand may not be unreasonably delayed. This rule, focusing on the plaintiff's conduct, conceptually starts the limitations period at the point where the plaintiff has had an opportunity to use due diligence in locating the property and making a demand, and has failed to do so
 
 
 [5]
 We have elected not to submit the unresolved state law issue in this appeal to the New York Court of Appeals pursuant to the recently authorized procedure permitting that Court to answer questions certified to it by the United States Supreme Court, a United States Court of Appeals, or a court of last resort of any state. See N.Y.Rules of Court Sec. 500.17 (N.Y.Ct.App.) (McKinney 1987). That valuable procedure should be confined to issues likely to recur with some frequency. See Kidney v. Kolmar Laboratories, Inc., 808 F.2d 955, 957 (2d Cir.1987). Though the issue presented by this appeal is interesting, we do not think it will recur with sufficient frequency to warrant use of the certification procedure
 
 
 [6]
 DeWeerth asserts that the CCPs would not have been helpful in her search because, pursuant to the agreement of the allied forces, the collecting points were established to deal with property looted by the Germans in occupied territory and not with property lost in Germany. See Kunstsammlungen Zu Weimar v. Elicofon, supra, 536 F.Supp. at 852. Even if the CCPs were not specifically created to restore art stolen from Germans, they were a potentially fruitful subject of investigation and ought to have been contacted. DeWeerth acknowledged that a painting her family had lost prior to the war found its way to the CCPs and the family attempted to reclaim it
 
 
 [7]
 Because we determine that DeWeerth's action is barred by the statute of limitations, we need not consider Baldinger's other claims with respect to laches and superior title