Thomas Law WILLCOX, Appellant,

v.

Rodger STROUP, Director, South Carolina Department of Archive and History; State of South Carolina, ex rel. Henry McMaster, Attorney General for the State of South Carolina, John M. Wilcox, and Kathryn Willcox Patterson, Appellees.

C.A. No. 2:05–2788–PMD.

United States District Court,
D. South Carolina,
Charleston Division.

Jan. 12, 2006.

Kenneth C. Krawcheck, Krawcheck and Davidson, Charleston, SC, for Appellant.

James Emory Smith, Jr., SC Attorney General's Office, John B. Butler, III, John B. Butler, III, PA, Rose Duggan Manos, Nexsen Pruet Jacobs and Pollard, Columbia, SC, for Appellees.

### ORDER

DUFFY, District Judge.

In an order filed August 15, 2005, United States Bankruptcy Judge John Waites ruled that certain Civil War era documents in the possession of Appellant Thomas Law Willcox ("Appellant") were not to be considered a part of his estate and that the State of South Carolina (the "State" or "Appellee") met its burden of proving superior title to these documents. This matter is before the court upon Appellant's appeal from this final decision of the Bankruptcy Court.

### DISCUSSION

Under 28 U.S.C. § 158(a), United States District Courts have jurisdiction to hear appeals of final judgments, orders, and decrees of Bankruptcy Courts.[1] On an appeal the district court may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Fed. R. Bank. P. 8013. The court has reviewed the file and determines that oral argument is not necessary. *Id.* ("Oral argument shall be allowed in all cases unless the district judge determines after examination of the briefs and record, or appendix to the brief, that oral argument is not needed.").

### Bankruptcy Court's Findings of Fact

The Bankruptcy Court's findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses. *Id.* After reviewing the Bankruptcy Judge's findings of fact, the court finds that there are no clear errors therein. Accordingly, the court adopts all of the Bankruptcy Court's findings of fact. The relevant facts are as follows:

---

1. 28 U.S.C. § 158 provides:
 (a) The district courts of the United States shall have jurisdiction to hear appeals
 (1) from final judgments, orders, and decrees;
 (2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
 (3) with leave of the court, from other interlocutory orders and decrees;
 and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

Appellant Willcox possesses approximately 444 documents (the "Documents") consisting of the records of two former Governors of South Carolina, Governors Francis Pickens (1860–1862) and Milledge Bonham (1862–1864), during their administrations. The Documents, which date from between December 1860 and August 1864, concern Confederate military reports, correspondence, and telegrams between various Confederate generals, officers, servicemen, and government officials, and related materials. The Documents also address a wide variety of official duties of the Governor during that time period. The parties presented a summary list description of the individual Documents. (Tr. Transcript, Pl. Exhibit 5.) These descriptions are very vague such that the court can not be sure of the exact content of the individual documents. As such, the court acknowledges that the examination of certain specific Documents could lead to differing conclusions as to their nature; however, the parties determined to present their positions as applicable to the Documents as a whole. (B.C. Order at 6.) Accordingly, the court adopts the Bankruptcy Court's finding of fact that the Documents are properly described as Governor's records relating "to matters of military significance, police powers, as well as to other duties of the Governors during the relevant time period." (B.C. Order at 10.)

Appellant found the Documents in a bag in his stepmother's closet after she passed away, sometime during 1999–2000. Appellant had not been aware of the existence of the Documents prior to this time. Appellant eventually sold a few Documents to different individuals and has given two to his wife. In May 2004, Appellant entered into a contract, through his company Haulover Development Corporation, to auction the remaining Documents. The Documents were previously appraised at approximately $2.4 million. The proposed auctioneer testified at trial and indicated that he had extensively marketed and advertised the auction of the Documents. The auctioneer also testified that he met with Appellee Rodger Stroup, Director of the South Carolina Department of Archives and History (the "Department of Archives") prior to the scheduled auction and that Stroup had sought permission to place the Documents on microfilm prior to sale for historical preservation purposes. Appellant agreed that the Documents could be microfilmed.

One day prior to the auction, Stroup and the Attorney General's Office for the State of South Carolina obtained a restraining order in state court preventing the sale of the Documents. Following the enjoinment of the auction, Appellant filed for bankruptcy protection under Chapter 11 of the United States Code on August 16, 2004. The complaint was thereafter filed in the Bankruptcy Court by the Appellant seeking a declaratory judgment as to his ownership of the Documents.

Appellant is the great-great-nephew of Confederate Major General Evander McIver Law, who served in the Civil War. The Documents, obtained at some point by General Law, passed from Annie Storm, descendant of General Law, to Blanche C. Law, Appellant's great-aunt and sister of his grandmother. Thereafter, Appellant contends that the Documents were passed to his father and then to him. The Documents have been in the possession of Appellant's family for over 140 years.[2] While the exact circumstances under which Gen-

---

**2.** Litigation with respect to any inter-family entitlement to the Documents was bifurcated upon the request of the parties, and any dispute between them is not addressed by this court.

eral Law came to possess the Documents are unclear, it is likely that the circumstances were as follows:

In December 1864, recently-elected Governor A.G. Magrath ordered the State Auditor, James Tupper, to prepare the State's records for removal from Columbia in preparation for the imminent attack upon Columbia by General Sherman. A large number of State archives and records were moved out of Columbia on February 16, 1865 and stored in locations in Chester and Spartanburg, South Carolina, presumably to preserve them from destruction. General Law was involved in the evacuation of Columbia in February of 1865, and it is likely that this was the time period during which General Law came into possession of the Documents. There is no evidence that General Law illegally obtained possession of the Documents.

The Documents have previously been made available for sale. On February 16, 1896, General Law himself sent a letter to a book dealer in New York regarding the sale of some of the Documents in question. (Tr. Transcript, Pl. Exhibit 10.) Some of the records of the Pickens and Bonham administration are at the Library of Congress, presumably sold to it from this same New York book dealer. In the late 1940s, the granddaughter of General Law, Annie Storm, corresponded with the University of North Carolina as well as with R.L. Meriweather of the South Caroliniana Library of South Carolina University regarding the possible sale of the Documents. (Tr. Transcript, Pl. Exhibits 11–38.) As a result of the correspondence, no sale was accomplished, but the Documents were placed on microfilm at the Southern Historical Society, University of North Carolina.

There is little information as to where Governor's records of the 1860s, such as the Documents, are kept or have been kept in the past. (Tr. Transcript, Pl. Exhibit 43.) Such records are spread about and private collectors and the South Carolina Historical Society, a private entity, have played a large role in their preservation. (*Id.*) It is clear, however, that the State does have some items similar to the Documents in their Department of Archives. For example, some official correspondences of other nineteenth-century Governors, similar to those in the Documents, are stored at the Archives. While the State Archives only has records of one antebellum Governor, it has *some* records of every other South Carolina Governor since 1860, with few exceptions.

**Bankruptcy Court's Conclusions of Law**

■ In considering an appeal from a bankruptcy court's determination, the district court must review de novo any conclusions of law. *In re Bogdan,* 414 F.3d 507, 510 (4th Cir.2005) ("[W]e review the bankruptcy court's factual findings for clear error, while we review questions of law de novo"); *Loudoun Leasing Dev. Co. v. Ford Motor Credit Co. (In re K & L Lakeland, Inc.),* 128 F.3d 203, 206 (4th Cir.1997) (holding that the "clearly erroneous" standard will not insulate findings "made on the basis of the application of incorrect legal standards").

The Bankruptcy Court concluded that: (1) under the common law, the State bears the burden of proving a superior title to the Documents;[3] (2) the Documents are

---

**3.** The Bankruptcy Court correctly concluded that, because possession is prima facie evidence of title to personal property, Appellant met his initial burden of proof of ownership. *Ex Parte Dort,* 238 S.C. 506, 121 S.E.2d 1

(1961). The Bankruptcy Court notes that "[t]he burden thus appears to shift to the State to prove superior title. South Carolina common law has established that in order to prove superior title, the challenging party

public records of the State of South Carolina; (3) under the common law, public records are the property of the State; and (4) none of the defenses alleged by Appellant preclude the State from asserting its claim to the Documents. Appellants contest conclusions of law 2 and 4. The court therefore reviews these conclusion of law de novo.

## 1. WERE THE DOCUMENTS CONSIDERED PUBLIC RECORDS WHEN THEY WERE FIRST PRODUCED?

■ The Bankruptcy Court found that the Documents were public records. This finding, the bedrock upon which the entire opinion relied, is essential to the State's claim of ownership. In reaching this conclusion, the Bankruptcy Court relied upon *State v. Farnum*, 73 S.C. 165, 53 S.E. 83 (1905). In this case, the South Carolina Supreme Court held that the county dispenser of intoxicating liquors is a state officer, and all books, documents, and letters in the dispensary relate prima facie to the public business; therefore, such records are rightly considered public records. The court reasoned that certain "papers are public documents ... for the reason that they relate either to the rightful discharge of the duties of the office of the defendant or to his violation of the official trust reposed by the state in him." *Id.* at 85. The Bankruptcy Court concluded that the Documents "as a whole appear to relate to the official duties of the public office of the Governor and, for the reasons stated herein, appear to be public records.

Plaintiff did not provide sufficient evidence that the Documents became personal property on the date of the respective Governor's resignation, departure, or loss of actual possession." (B.C. Order at 18.)

Appellant argues that this line of reasoning is misapplied. *Farnum* was decided over forty years after the Documents were produced. As such, its reasoning is not necessarily applicable to the case at hand. Appellant rightly asserts that if "the State has a viable claim, it must rest on the common law as it existed in 1865." (Appeal at 21.)

After a thorough review of the record, the court finds no persuasive evidence to support the State's contention that, prior to 1865, the records of the state executive branch were considered public records. As a South Carolina court in 1848 pronounced, "The public records in the Secretary of State's office do not belong to the Secretary; *they are the property of the State.* He is the mere keeper under her authority. Whatever she wills about them, he is bound to obey."[4] *Pinckney v. Henegan*, 2 Strob. 250, 1848 WL 2877, *2 (S.C.App. Law 1848). The court interprets this informative excerpt to mean that at least those documents *in the care of the Secretary of State* are public records, indisputably the property of the State.[5] There is no evidence that the Documents, which date from between 1860 and 1864, were ever in the Secretary of State's office. In December of 1865, the State Legislature passed an Act by which the Execu-

---

cannot rely solely upon the weakness of the possessor's title." (BC Order at 9.)

**4.** Appellees rely upon this case for the proposition that the Documents, if public records, are the property of the state. While this is undoubtably true, it presupposes that the Documents are in fact public records.

**5.** The court does not conclude that *only* those documents in the care of the Secretary of State were public records. The fact that the Documents were not in the care of the Secretary is not conclusive proof that they are not public record; however, contrary to the State's assertion, this case cannot stand for the proposition that they definitely were.

tive branch of the State was required to maintain records of its activities. See *An Act to Organize the Executive Department of the State*, Act 4754, Statutes at Large of South Carolina, Vol. XIII, Statutes at Large (rep. Printing 1875). This 1865 statute gave the Secretary of State responsibility to "as soon as practicable, collect, deposit and keep in Columbia all the books, records and papers belonging thereto [the Executive Chamber]." Following this Act, it is reasonable to conclude that Executive records, now in the possession of the Secretary, were considered public records. However, the State has presented no evidence, that, prior to this Act, the Secretary of State had any control over documents produced by the Executive branch. The wording of the statute, indicating that the Secretary should begin this duty "as soon as practicable," further leads the court to believe that such a duty was not imposed prior to this date. As such, the 1865 statute, read in conjunction with the 1848 case, undermines rather than supports the State's assertion that Governor's records were public records prior to 1865.

*Sternberger v. McSween*, a South Carolina case from 1880, further supports Appellant's contention that the Documents are not public records. As was described by this South Carolina court regarding the import of filing a notice of a lien,

"When papers are placed on file in a public office, they become public records, open to the inspection of the public, under proper regulations; but if private individuals are at liberty to remove them whenever they see fit, they necessarily lose their character as public records. They are in the custody of the officer in whose office they are filed, and he is responsible for them. If he chooses to allow individuals to remove the originals rather than to require them to procure copies, that is a matter of mere favor and not of right, and while we may not feel called upon to volunteer a condemnation of such a practice, we certainly cannot be expected to give it judicial sanction. As is said in 1 *Bouv. Law Dict.* 524: 'A paper is said to be filed when it is delivered to the proper officer and by him received *to be kept on file.*'"

*Sternberger v. McSween*, 14 S.C. 35, 39 (S.C.1880). Under this definition, the Documents are necessarily not public records because they are not, and no evidence proves that they ever were, "on file in a public office."[6] *Id.*

The court is therefore persuaded that the State has failed to prove that the Documents were public records when they were produced. The State's interest in them now does not retroactively make them so. While the court understands and sympathizes with the States admirable desire to preserve and make accessible documents relevant to South Carolina history, such an interest cannot supercede an individual's rights in his personal property. The State, as well as any other private

---

6. While irrelevant to the case at hand, the court notes that the modern definition of "public record" continues to be unhelpful to the State's case. According to the Public Records Act, 1962 Code of Law, " 'Public record' includes all books, papers, maps, photographs, cards, tapes, recordings, or other documentary materials regardless of physical form or characteristics prepared, *owned, used, in the possession of, or retained by a public body.*" Freedom of Information Act, S.C. ST § 30–4–20(c). The court does not adopt the circular logic that the Documents are not public records because they are not in the possession of a public body; however, the court does opine that this statute, upon which the Bankruptcy Court relied in rendering its opinion, does not offer any support to the contention that the Documents are public records. Further, the court notes that, even if documents of a similar nature to the Documents were public records, the State has offered no evidence that these actual Documents were ever so considered.

collector, may obtain these Documents by purchasing them from Appellant for a competitive price.

The court also notes that the ruling of the Bankruptcy Court, if upheld, would set a dangerous and disruptive precedent. As Appellee's own expert testified, the Documents are similar in scope and type to collections of South Carolina papers held by both the Library of Congress and Duke University. (Tr. Vol.II, p. 30.) The form of docketing and the type of information contained in these collections are very similar to those found in the Documents. (*Id.*) These collections at the Library of Congress and at Duke were purchased from private collectors. (*Id.*) To assert that such documents are truly and properly the property of South Carolina would fly in the face of well-settled and unchallenged archival practices. While the Bankruptcy Court is careful to note that "the nature and ownership of those documents are not before the Court," a ruling that the State is the owner of the Documents is sure to throw into question the ownership of similar documents. (B.C. Order at 24.)

Given that the State has neither introduced a statute or case law that establishes that Governor's records were matters of public record prior to 1865, nor has the State presented sufficient evidence that these particular Documents were ever in the possession of the Secretary of State, the court cannot find that it has met its burden to prove superior title to the Documents. The later statutes and case law upon which the Bankruptcy Court relied are misleading and inapplicable to the determination of ownership. Regardless of whether the State came to regard Executive papers as public records at some point following the creation of the Documents,

the State presents no evidence that proves that these Documents were so considered at the time. The fact that several private archives are now in possession of similar Executive Branch documents is good evidence that such papers were not valued and preserved by the State at the relevant times. Accordingly, the court rules that, because they are not public records, the State has no claim of ownership of these Documents. Title to the Documents therefore properly resides with Appellant, Mr. Thomas Law Willcox.[7]

## 2. DOES APPELLANT HAVE A DEFENSE TO THE STATE'S CLAIMS?

Appellant argues that the Bankruptcy Court erred in finding that he had no viable defenses to the State's claim. On appeal, Appellant asserts that the defenses of statute of limitations, staleness, waiver, estoppel, and laches were wrongfully denied. The court address each of these defenses in turn.

### a. Statute of Limitations

■ Appellant argued before the Bankruptcy Court that the State should be barred by the statute of limitations from asserting its claim to the Documents. In support of this contention, Appellant presented evidence that the State, through Dr. Meriwether, an employee of the South Caroliniana Library, a branch of the University of South Carolina, had actual knowledge of the Law family's possession of the Documents as early as 1947. Dr. Meriwether and Mrs. Annie Storm carried on substantial correspondence in and around 1947 concerning the Library's possible acquisition of the Documents. The Appellant presented further evidence that

---

7. This ruling has no bearing on any possible suits regarding ownership as among the members of the Willcox/Patterson family.

the applicable statute of limitations in the 1940s was six years. As such, Appellant reasoned that the State's failure to act upon its claim of ownership prior to 1954 precludes it from asserting the present action.

The Bankruptcy Court found that Dr. Meriwether was acting within his capacity as an employee of the Library when he corresponded with Mrs. Storm regarding the Documents in 1947; however, the Court also found that Dr. Meriwether's knowledge did not commence tolling of the statute of limitations as against the State because, in 1947, the Historical Commission of South Carolina, not the South Caroliniana Library, had the care and custody, by statute, of all the official archives of the State of South Carolina. As such, the Bankruptcy Court concluded that only actual knowledge of an employee of the Historical Commission could be imputed to the State. Appellant argues that such a conclusion is in error.

 The court now finds that the Bankruptcy Court did so err. The determination under the discovery rule for a statute of limitations is objective, rather than subjective; as such, the question is not whether the particular plaintiff *actually* knew she had a claim, but is whether the circumstances of the case would put a plaintiff of common knowledge and experience on notice that some right of hers has been invaded or that some claim against another party might exist. *Martin v. Companion Healthcare Corp.*, 357 S.C. 570, 593 S.E.2d 624 (Ct.App.2004); *Walsh v. Woods*, 358 S.C. 259, 594 S.E.2d 548 (Ct.App.2004) ("To determine whether statute of limitations has run, court does not consider whether particular plaintiff in case before court knew he or she had a

claim, but rather whether circumstances of case would put a person of common knowledge and experience on notice that some right of his has been invaded, or that some claim against another party might exist."). As such, under South Carolina law, the statute of limitations begins to run when a cause of action reasonably ought to have been discovered. *Rumpf v. Massachusetts Mut. Life Ins. Co.*, 357 S.C. 386, 593 S.E.2d 183 (Ct.App.2004).

With regard to when the State "ought to have discovered" it had a cause of action, the court finds instructive a case which comes from the United States Court of Appeals for the Second Circuit, interpreting a New York statute of limitations for the recovery of personal property, which like South Carolina law, has a due diligence requirement for the plaintiff.[8] The New York law interpreted in *DeWeerth v. Baldinger*, 836 F.2d 103 (2nd Cir.1987), provided a three-year statute of limitations for the recovery of personal property, running from the time demand is first made on the good faith purchaser. Demand cannot, however, be unreasonably delayed. Even where the true owner does not know where the property is, his obligation not to unreasonably delay demand includes an obligation to make a reasonable effort to locate the property. *Id.* In *DeWeerth*, the German owner of a painting stolen from her by occupying troops in World War II in 1945, had no idea where the property was. Despite the fact that she (i) contacted authorities, (ii) filed a report with the military government in 1946, (iii) sought legal advice in 1948, (iv) contacted an art expert to investigate in 1955, (v) notified the West German federal bureau of investigation in 1957, (vi) found mention of the painting as having been sold by a New

---

8. This Second Circuit case, while not binding precedent on the court, was cited with approval by the Federal District Court of South Carolina in *Baskin v. Seajay Society, Inc.*, 1997 WL 910371, *6 (D.S.C.1997).

York art dealer, such mention being found in 1981 in a catalogue of the painter's work published in 1974, such catalogue being located in a museum, (vii) retained counsel immediately thereafter in 1982, (viii) sued the art dealer in 1982 to learn the identity of the good faith purchaser, (ix) made immediate demand on the good faith purchaser in 1982 as soon as she discovered her name, and (x) brought suit in 1983 immediately after demand was rejected, the original owner's claim was time barred because she had not exercised "reasonable diligence" to locate the property. *Id.* She had a whole world to search, did search, and was still time-barred.

With this case in mind, the court has no difficulty in finding that the State, with minimal inquiry, ought to have discovered this alleged injury many years prior to the instant case. In 1896, General Law organized the sale of certain South Carolina documents to a New York book dealer. Presumably, these are the documents that eventually landed in the Library of Congress. At that time, he openly acted as a rightful and lawful owner of the Documents, and exercised unfettered rights of ownership, including the right to sell them. In 1947, Mrs. Storm wrote to Dr. Meriwether, an employee of the State, that "[f]or some years I have tried to get into direct contact with someone in South Carolina who could tell me how such papers could or would be preserved within the State ... but so far I have been unable to get any such assurances from anyone in South Carolina." She further asserted that her "valuable collection of South Carolina papers" included "actual State House papers-the originals." (Tr. Transcript, Pl. Exhibit 35.) The State made no claim of ownership at that time. Dr. Meriwether, upon hearing that the collection included "State House papers" certainly never made any such claim, but rather, acting upon the assumption that Mrs. Storm was the rightful owner, asked that she give the papers to the Library as a gift, or, if necessary, the Library would "undertake the purchase." (Tr. Transcript, Pl. Exhibit 37.) At no time did General Law or Mrs. Storm act in a furtive, or clandestine manner in arranging these sales. To the contrary, these sales were conducted in an open manner, with Mrs. Storm even contacting employees of the State regarding the possible sale. Further, microfilm versions of the Documents have been accessible to the public at the University of North Carolina since the 1940s, and originals from General Law's collection have been at the Library of Congress since before the turn of the century. Surely, if the State were interested, it would have investigated the source of the documents in either the Library of Congress or at the University of North Carolina. Even a cursory investigation would have led the State to the Documents, which have been in the undisturbed possession of the Law/Willcox family for five generations. Unlike the obstacles faced by the German plaintiff in the *DeWeerth* case, the State had the Documents within its boundaries and openly possessed by one of its citizens for over 140 years and yet, had Appellant not informed the State of the impending sale, the State would *still* not know of the Documents' location. Such inaction cannot be said to be the exercise of reasonable diligence in locating its alleged missing property.

In this case, even if Dr. Meriwether's knowledge of the Documents cannot be considered to impute *actual* knowledge to the State, the Law family's open and unabashed possession and exercise of ownership over the Documents was such that, upon minimal and reasonable inquiry, the State should have known of them. The State has therefore failed to satisfy its duty to make a reasonable effort to locate

the property. As such, the court finds that the State is barred by the statute of limitations from asserting any claim of ownership as to these Documents.

### b. Staleness

 Under South Carolina law, a stale demand is "one that has for a long time remained unasserted; one that is first asserted after an *unexplained delay* of such great length as to render it difficult or *impossible for the court to ascertain the truth of the matters in controversy* and to do justice between the parties, or as to create a presumption against the existence or validity of the claim, or a presumption that it has been abandoned or satisfied." *Presbyterian Church v. Pendarvis*, 227 S.C. 50, 86 S.E.2d 740, 744 (quoting *Bell v. Mackey*, 191 S.C. 105, 123, 3 S.E.2d 816, 824 (1939)). The Bankruptcy Court found that, because the State could not be said to have had actual knowledge of the Documents, any delay in bringing this case is excused and the claim is therefore not barred by staleness. The court disagrees.

In this case, the Law/Willcox family has been in open and obvious possession of the Documents for over 140 years. As discussed above, upon minimal investigation of the source of the documents in either the Library of Congress or the University of North Carolina, the State would have been led to the Documents. The State has not explained its failure to do so and earlier bring suit. This unexplained delay has undoubtably resulted in the court's inability to "ascertain the truth of the matters in controversy." *Id.; see also All Saints Parish, Waccamaw v. Protestant Episcopal Church in the Diocese of South Carolina*, 358 S.C. 209, 595 S.E.2d 253, 268–269 (Ct.App.2004); *Presbyterian Church of James Island v. Pendarvis*, 227 S.C. 50, 86 S.E.2d 740 (1955). At this late date, every person who had actual knowledge of how the Documents were held prior to coming into the possession of General Law or had some knowledge of how General Law came into such possession is dead. The court must therefore speculate as to the origin of the Documents, how they came to be in the possession of General Law, and whether they were ever meant to be public in nature. The passage of time, as well as the ravages of Civil War and Reconstruction, have made it all but impossible to ascertain the true nature of the facts necessary to support the State's claim. Accordingly, in the interests of justice, the court finds that staleness bars the State's claim of ownership.

### c. Laches, Abandonment, and Waiver

 Under South Carolina law, the defenses of laches, abandonment and waiver all require a showing that the claimant had actual knowledge of his rights and then made some affirmative repudiation of those rights. To prove laches, a party must establish: "(1) delay, (2) unreasonable delay, [and] (3) prejudice." *Hallums v. Hallums*, 296 S.C. 195, 371 S.E.2d 525, 528 (1988); *see Arceneaux v. Arrington*, 284 S.C. 500, 327 S.E.2d 357, 358 (Ct.App. 1985). In addition, "the circumstances must ... [be] such as to import that the complainant had abandoned or surrendered the claim or right which he now asserts." *Byars v. Cherokee County*, 237 S.C. 548, 118 S.E.2d 324, 330 (1961); *see Pendarvis*, 86 S.E.2d at 744. In order to abandon a right, "there must be some clear and unmistakable affirmative act or series of acts indicating a purpose to repudiate ownership." *Witt v. Poole*, 182 S.C. 110, 188 S.E. 496, 498 (1938). Similarly, waiver is defined as a "simple voluntary relinquishment of a right with knowledge of all the facts." *City of North Myrtle Beach v. Lewis–Davis*, 360 S.C. 225, 599 S.E.2d 462, 466 (Ct.App.2004).

The court finds that the Bankruptcy Court correctly denied Appellant's defenses of laches, abandonment and waiver. While the court finds that, objectively, the State could have and should have known of the Appellant's possession of the contested Documents, the Appellant has failed to make an adequate showing that the State had such actual knowledge.

### CONCLUSION

The court hereby finds that the Bankruptcy Court erred in finding that the Documents are public records and in denying Appellant's statute of limitations and staleness defenses. It is therefore **ORDERED,** for the foregoing reasons, that the judgment of the Bankruptcy Court is **REVERSED;** and it is further

**ORDERED** that the State has not met its burden of proving superior title to the Documents; and it is further

**ORDERED** that the State is barred from asserting an ownership interest in the Documents due to the running of the statute of limitations and staleness; and it is further

**ORDERED** that the Documents are therefore the property of the Appellant Thomas Law Wilcox; and it is further

**ORDERED** that this ruling has no effect on the claims of the Willcox and Patterson Defendants, which may be brought at any time; and it is further

**ORDERED** that the Appellant's Motion to Stay execution of the judgment of the Bankruptcy Court is hereby rendered moot.

**AND IT IS SO ORDERED.**