2342

TOWN OF SULLIVANS ISLAND and State of South Carolina, Respondents v. Milton R. FELGER, Appellant.

(457 S.E. (2d) 626)

Court of Appeals

*Gerald M. Finkel* and *Gilbert Scott Bagnell*, both of *Finkel, Goldberg, Sheftman & Altman*, Columbia, *for appellant.*

*Atty. Gen. T. Travis Medlock* and *Sr. Asst. Atty. Gen. Kenneth P. Woodington,* Columbia, and *Lawrence A. Dodds, Jr.,* Mt. Pleasant, *for respondents.*

Heard May 8, 1995.

Decided May 1, 1995.

CURETON, Justice:

The Town of Sullivans Island and the State of South Carolina commenced this declaratory judgment action against Milton Felger seeking a judicial determination that Felger's interest in certain marshlands located on Sullivans Island is limited to the right to plant and harvest oysters. They also asked the court to rule that the interest applies only to intertidal lands, that is, land below the mean high water mark and above the mean low water mark of an adjoining body of water called Conch Creek. Felger asserted fee simple ownership of the marshlands as well as to adjacent highlands. He further asserted that the boundaries of the tract in question had been established in litigation commenced in 1982 between Felger and the State of South Carolina. The master sustained the State's and the Town's position. Felger appeals. We affirm.

This appeal concerns approximately 90 acres of real property located on the northern side of Sullivans Island. The property is bordered on the north, west, and east by Conch Creek. These boundaries are not in dispute. The subject of this action is the southern boundary of the property. In his brief, Felger delineates the positions of the parties as follows:

> Simplifying the positions of the parties, it would be fair to state that Felger asserts that the grant of all "marsh" depicted in the 1843 plat included wetlands that are not tidelands (that is property between the mean high and high high marks), and that the grant of marshlands above the mean high tide line created a fixed boundary. In contrast, Respondents seek to equate the "marsh" with tidelands, and place its southern boundary along the ever changing mean high tide line.

Felger's interest in the subject property emanates from an 1843 Joint Resolution of the South Carolina General Assem-

bly. Pursuant to the 1843 Resolution, the General Assembly granted David Truesdell an interest in marshlands abutting the eastern end of Sullivans Island. The resolution provides, in pertinent part:

> Resolved, that the exclusive use of the portion of marsh included in the plat accompanying this petition, be granted to David Truesdell, to use the same as a place for planting oysters during the pleasure of the Legislature, and he shall be entitled to possess the oysters so planted as his private property: Provided, that the same not be enclosed or embanked, so as to prevent the free and natural flow of the salt water, over the same, and that it remain in its natural state and be in no way altered therefrom, but by the authority of the Town Council of Moultrieville from time to time, and be at all times subject to the authority of the same. . . . And provided, further, that it shall be lawful for the public at all times to have free access, to the same, and to pass over the same as hitherto.

Felger acquired an interest in the property in 1980 from Sadie Stender who along with her two sisters, were the testamentary beneficiaries of Mary Magwood. According to Felger, Mary Magwood died seized and possessed of the subject property.

In 1982, Felger instituted a declaratory judgment action ("The 1982 litigation") against the State of South Carolina seeking, among other things (1) a judicial determination of any claims to the property adverse to Felger's (2) judicial declaration that Felger had a leasehold estate of no less than an undivided one-third interest in the property, (3) an order enjoining the State from leasing the property and (4) an order requiring the State to account for all revenues derived from any such leasing. The State denied Felger's claim to an undivided one-third interest in the property and claimed the "lease" had been cancelled. By order dated March 2, 1985, the court found Felger and Sadie Stender's two sisters "own" the property to the low water mark of the Conch Creek.

I.

On appeal, Felger argues the instant litigation is barred by

*res judicata* as to the State and by collateral estoppel as to the Town. We disagree.

The doctrine of *res judicata* is founded on the principle that the public interest requires an end to litigation and that no one should be twice sued for the same cause of action. *Winthrop v. Mullins,* 211 S.C. 351, 45, S.E. (2d) 332 (1947); *Hayes v. Hayes,* 312 S.C. 141, 439 S.E. (2d) 305 (Ct. App. 1993). Under the doctrine of *res judicata,* a final judgment on the merits in a prior action will preclude the parties and their privies from re-litigating any issues actually litigated or those that might have been litigated in the first action. *Griggs v. Griggs,* 214 S.C. 177, 51 S.E. (2d) 622 (1949); *Foran v. USAA Casualty Ins. Co.,* 311 S.C. 189, 427 S.E. (2d) 918 (Ct. App. 1993). The doctrine requires three essential elements: (1) the judgment must be final, valid and on the merits; (2) the parties in the subsequent action must be identical to those in their first; and (3) the second action must involve matter properly included in the first action. *Id.: Owenby v. Owens Corning Fiberglas,* 313 S.C. 181, 437 S.E. (2d) 130 (Ct. App. 1993).

The doctrine of collateral estoppel, or issue preclusion, on the other hand, rests generally on equitable principles. *Watson v. Goldsmith,* 205, S.C. 215, 31 S.E. (2d) 317 (1944). In order to successfully assert collateral estoppel, the party seeking issue preclusion must show that the issue was actually litigated and directly determined in the prior action, and that the matter or fact directly in issue was necessary to support the first judgment. *Richhburg v. Baughman,* 290 S.C. 431, 351 S.E. (2d) 164 (1986); *Beall v. Doe,* 281 S.C. 363, 371, 315 S.E. (2d) 186, 191 (Ct. App. 1984).

Here, neither *res judicata* nor collateral estoppel is applicable to the southern boundary dispute because the 1982 litigation was limited to establishing the northern boundary of subject property, that is, the litigation determined the property is bounded on the north by the low water mark of Conch Creek. At the hearing of the 1982 case, counsel for Felger asserted:

[I]t is [Felger's] contention that the issue in this case is whether or not the state by the lease . . . of 1843 . . . intended to convey down to the low water mark or not. And

that the evidence that [Felger] will show in this is that, one, all of the land subject to the two conveyances was under the high water mark.

Nothing in the 1982 litigation placed in issue the southern boundary of the tract. Nothing in Felger's arguments made during the 1982 litigation indicated Felger claimed an interest in the highland strip now at issue or that there was any dispute as to the southern boundary of the property. In fact, Felger's counsel specifically stated "this [1982] lawsuit is limited to the issue with the state as to the *tidelands.*" (Emphasis ours.) Tidelands by definition do not include highlands. *See State v. Fain,* 273 S.C. 748, 259 S.E. (2d) 606 (1979); *State v. Yelsen Land Co.,* 265 S.C. 78, 216 S.E. (2d) 876 (1975); *State v. Hardee,* 259 S.C. 535, 193 S.E. (2d) 497 (1972). Even the trial court in the 1982 litigation stated in its order "[t]he issue presently before this court is whether [t]he issue presently before this court is whether [the 1843 joint resolution] conveyed property down to the low water mark." Thus, the southern boundary of the subject property was not actually at issue in the first litigation and, accordingly, the boundary issue in the 1982 litigation is not *res judicata* as to the issues in the instant case, nor does collateral estoppel operate to bar the instant boundary dispute.

Further analysis of the contentions of the parties to the 1982 proceeding also demonstrates the contrariety of Felger's position. In that proceeding Felger contended, and the court found, that all of the land in question was covered by water at high tide and thus was intended to be conveyed as marshlands by the 1843 resolution. In so finding, the court rejected the State's position, which appears to be Felger's position in this appeal, that there is a strip of land between the mean high water mark and the high water mark that was considered high marshlands and conveyed in the 1843 grant.[1]

---

[1] Felger cites a passage from the transcript of the 1982 litigation wherein counsel for the State concedes Felger "owns" highlands. However, it is clear from the transcript that the highland he referred to was "spoil area" which apparently was formed by mud being dug from the creek by the Corps of Engineers. As best we can tell, this spoil area would constitute an island within the marsh. We note further that the 1982 trial court concluded Felger had not shown that such a spoil area in fact existed.

## II.

Next, Felger argues the master erred in failing to find the Town has no claim to the property even if Felger has no interest. We disagree.

SCRCP 17(a) provides that in order to have standing to sue, a plaintiff must be a real party in interest. "A real party in interest is one who has a real, material, or substantial interest in the subject matter of the litigation, as opposed to one who has only a nominal or technical interest in the action." *Anchor Point, Inc. v. Shoal Sewer Co.*, 308 S.C. 422, 418 S.E. (2d) 546 (1992). We hold the Town has a real, material or substantial interest in the case. Section 1 of Act No. 420 of 1953 vests authority in the Town, as agent for the State, to execute fee simple deeds to lots on Sullivans Island that qualify for conversion and the location and dimension of lots. Also, as noted above, the marsh interest pursuant to the 1843 grant was at all times subject to the authority of the Town Council. In light of the Act's broad legislative grant of power, and the Town's obvious interest in the disposition of the subject property, we hold the Town has standing property, we hold the Town has standing to participate in this suit.

## III.

Felger also argues the master erred in failing to find he is entitled to fee simple title to the subject property.

We disagree and adopt the master's reasoning with minor modifications. The master found:

> Felger contends that his 1843 oyster interest is eligible for conversion into a fee simple title under the 1953 state statute. . . . A reading of the relevant statutes leaves no question [but] that the legislature authorized only the conversion to fee simple title of *lot leases* of *one-half acre* or less. These leases originated as lot licenses which were first acquired by constructing houses on the property, later [confirmed through the Town Council], and finally converted into leases by [legislative action]. Felger's interest is entirely different from those eligible for conversion to fee simple titles. For a fuller understanding of the differences between a regular lot lease and Felger's interest, it is necessary to review briefly the history of the unique system of landholding on Sullivans Island.

In 1791, the General Assembly enacted the following Joint Resolution which provided the foundation for real property rights on Sullivans Island:

> Such of the citizens of this State as may think it beneficial to their health to reside on Sullivans Island during the summer season have liberty to build on the said island a dwelling and outhouses for their accommodation; and the person or persons *so building* shall have the exclusive right to the same, *and one-half acre of land adjoining thereto*, a long as he, she, or they, may require, for the proposes aforesaid: Provided, The person or persons, building as aforesaid, pay to the Treasurer one penny annually, if required, for the use of the said land.

*Joint Resolution* dated January 31, 1791 (emphasis added).

By 1819, the General Assembly thought it necessary to pass another act making it clear that in order to obtain the right to occupy a lot, one actually had to build a dwelling. The 1819 Act, 6 Stat. 131, provided that "[n]o exclusive right to a lot on the said island shall be obtained by any citizen otherwise than by his actually building a dwelling house thereon. . . ." In 1857, the General Assembly converted the lotholders' interests, which it characterized as licenses, into the equivalent of leasehold interests. That act provided in part:

> The present owners of lots on Sullivans Island, whereon dwelling houses have been erected, and such citizens of this State may hereafter build dwelling houses upon the said island, *under the license granted by the Joint Resolution passed [in 1791]*, shall be taken and deemed to have, and shall enjoy, the same rights, titles, and interests, as tenants, from year to year, in and to the *lots* now owned by them, respectively. . . .

Act No. 4340 of 1857, 12 Stat. 609. (Emphasis added.)

Until 1873, it is unclear how, if at all, any records were kept of who owned what lot. Beginning in 1973, however, the General Assembly enacted legislation which expanded local control over the island and formalized the land licensing process. Act no. 376 of 1873, 15 Stat. 445, 450. That act provided as follows:

Sec. 11. That all persons who may desire to use any lot on said island shall apply to the Town Council for permission to do so, and no occupation of such lots shall be valid except with the consent of the said Town Council first had and obtained.

*Id.* at 450.

Beginning with the 1873 Act, the State delegated to the Town Council (later the Board of Township Commissioners) the authority to grant lot licenses, apparently including a requirement that all persons already occupying lots register with the Town Council. The duration of the licenses was as set forth in the 1857 statute—the occupants were to be treated as tenants from year to year, with a right of the State to re-occupy the lots.

In 1939, the General Assembly appointed a study committee to inquire into "any and all needs for legislation in reference to the Township of Sullivans Island, including the fee simple question" and to make recommendations. Act No. 450 of 1939. The same statute provided that "every person holding a license to use, occupy and enjoy a *lot* on Sullivans Island granted by the Board of Township Commissioners of Sullivans Island, or their predecessors in office" would be deemed to hold a 50-year license, the term beginning in 1939. Act No. 864 of 1940 effectively made these licenses practically perpetual by providing that a new 50-year term would begin whenever a license was transferred by deed, will or intestacy. The 1939 legislation was repealed, either expressly or implied.

In 1951, the lot licenses became even more like permanent deeds when the General Assembly enacted Act No. 377 of 1951, 47 Stat. 540. Section 1 of that act provided that all persons who in 1951 held "a license to use, occupy and enjoy any *lot* on Sullivans Island granted to them or their predecessors in title by the board of township commissioners of Sullivans Island, or their predecessors in office" shall hold a 75-year lease effective beginning on January 1, 1951. (Emphasis added.) This 1951 statute was the first time the General Assembly characterized the lotholders's interests as "leases."

Finally, Act No. 420 of 1953 provided that upon payment of twenty-five dollars, the owners of the lot leases on Sullivans Island could receive a fee simple deed to their respective lots. Section 1 of the 1953 [Act] is very specific in describing the

lots eligible for conversion into fee titles, and they do not included anything like this oyster interest. The 1953 Act provides that fee titles may be obtained "by the owner of any *leasehold estate . . .* in any *lot* on Sullivans Island *granted to him or his predecessor in interest by the Board or by the Town Council of Moultrieville, or their predecessors in office. . . ."* (Emphasis added.)

It is readily apparent that the 130 acre oyster interest on which Felger's claims are based is not a "lot" as that term had been used in over 150 years of legislation which dealt solely with the lots of up to one-half acre which were initially acquired by constructing dwellings thereon and later applying the Town authorities for a license.

Although we accept Felger's claim that the court in the 1982 litigation characterized his interest in the subject property as a leasehold interest[2] we agree with the master's conclusion that Felger's interest is entirely different from the lot leases which were first acquired by those who built dwelling houses on lots, thereafter confirmed by license from the Town, then converted into leases by the 1951 legislation, and finally permitted to be converted into fee title the 1953 legislation. It is clear that the purpose of the lot licensing and conversion statutes was to protect those persons who had built houses on small lots of highlands. It is just as clear that the purpose of the 1843 grant to Felger's predecessor in title was to provide him marshlands on which he could plant and harvest oysters. The lease of oyster planting grounds as generally understood over the years, is limited to the right to plant and harvest oysters. The Lessee obtains no "ownership" interest in the oyster grounds themselves. 36A C.J.S. *Fish* §§ 11-13(1961); *see also* 1970 Op. S.C. Att'y Gen. 254. Since Felger's interest does not come within the terms of the applicable resolutions and statutes, his interest is no one which is eligible for conversion into a fee simple estate. We sustain the conclusion of the master.

---

[2] We note that while the pleadings and practically all references to the 1982 litigation referred to Felger's interest as a lease, the court's order does state Felger "owns" the property. We think, however, the use of the word "own" was inadvertent. The word "own" is found in the preface to the decretal portion of the order which also refers to two other properties Felger was found to own in fee simple. During the 1982 trial, the judge pointedly noted that Felger's lease interest was limited.

## IV.

Felger also contends the master erred in ruling property owners with land adjacent to Felger's may erect docks across the subject property. As we understand Felger's argument, however, it is based solely upon his contention that he is entitled to have the subject marshland converted into fee simple title. Because we have held he does not have a lease that may be converted into fee simple title, his argument fails.[3]

## V.

Finally, Felger argues the respondents in refusing to afford him fee simple title to the land in question denied him equal protection of the laws because they have afforded fee simple title to adjacent property owners who are similarly situated. As we understand this argument, it relates to two types of property owners. First there are four lot owners to the immediate south of Felger's property whose lots have been extended into the highlands owned by the State. Then there are property owners located generally east of Felger's property described in respondents' brief as "lots and marsh east of the wharf site." As pertains to the lots east of the wharf site, the principal error Felger makes in his argument is equating the character of his right of ownership under the 1843 Joint Resolution to that of those property

---

[3] Felger's Statement of the Issue on Appeal is as follows: "The court erred in allowing adjacent owners to build docks across the property, the error being that Felger should have been awarded fee single title." A party is bound by his statement of an issue on appeal. 16 S.C. Juris *Appeal and Error* § 93 (1992). We do not understand Felger's argument in his brief to claim that although he has only a leasehold estate of some sort, he can still prevent the erection of docks across the property. We specifically decline to hold, however, that the 1843 Joint Resolution gave adjacent land owners authority to construct docks on the marsh property. The 1843 resolution reserves to the public generally the right of access to the marshlands, but does not purport to grant a use to adjacent lot owners different from that afforded the public. *See* 65 C.J.S. *Navigable Waters* § 67 (1966). Moreover, the construction of these docks may be regulated by other State laws and regulations. *See State v. Fain*, 273 S.C. 748, 259 S.E. (2d) 606 (1979). Further, the 1843 grant prohibits the marsh from being altered from "its natural state." Finally, the court's observation that a riparian owner's right to "wharf out to water is superior to the owner of a oyster bed" may be inapplicable in view of the fact that the state claims to own land between the marsh and the lots. If that is the case, the lot owners or at least some of them would not qualify as riparian or littoral owners.

owners under the 1839 resolution. The 1843 resolution specifically states that it is granting the "exclusive use of [a] portion of marsh . . . to use the same as a place for planting oysters . . . the same shall not be enclosed or embanked, [or changed from] . . . its natural state." By contrast, the 1839 resolution covering the land east of the wharf site states that the land contains both highland and marshland and grants permission to "occupy and enclose" the affected land. Also the resolution gives to its grantee the right to occupy the land on the same condition as other occupants of the island under the 1791 resolution of the General Assembly and makes no specific reservation of rights to the public. Clearly, the character of Felger's ownership under the 1843 resolution is not the same as those holding under the 1839 grant.

As to the four lot owners immediately south of Felger's leasehold property, Felger complains the State is treating him differently from these property owners because the Town has by deed extended their lots north into the highland area owned by the state, but has refused to extend his property south into the same area. Felger's interest in extending his property interest into the highlands area just south of his property is not the same as the four lot owners. In the first place, the lots' owners have fee simple title to their lots and thus the extension simply expands the size of their lots. On the other hand, Felger has a limited leasehold interest in the marshland for no fixed term and, thus, would appear to be simply a tenant at will. *See, Nimmer v. Chewning,* 155 S.C. 528, 152 S.E. 702 (1930) (provision in lease stating lessee shall retain premises so long as desired is a tenancy at will). Thus, we find no merits to Felger's equal protection arguments. *Hanvey v. Oconee Memorial Hosp.,* 308 S.C. 1, 416 S.E. (2d) 623 (1992) (To satisfy equal protection, classification must bear reasonable relation to legislative purpose sought to be achieved, members to class must be treated alike under similar circumstances, and classification must rest on some rational basis).

All other issues argued by Felger on appeal are manifestly without merit and we elect to dispose of them under Rule 220(b))2), SCACR; S.C. Code Ann. § 14-8-250 (Supp. 1994); *Cape Romain Land & Improvement Co. v. Georgia-Carolina Canning Co.,* 148 S.C. 428, 146 S.E. 434 (1928); and *Voelker v. Hillock,* 288 S.C. 622, 344 S.E. (2d) 177 (Ct. App. 1986).

For the foregoing reasons, the decision of the master is Affirmed.

HOWELL, C.J., and CONNOR, J., concur.