16988

THE PRESBYTERIAN CHURCH OF JAMES ISLAND,
Respondent, v. W. F. PENDARVIS, Appellant

(86 S. E. (2d) 740)

*William H. Grimball, Jr., Esq.*, of Charleston, *for Appellant,*

*Messrs. Waring & Brockinton,* of Charleston, *for Respondent,*

April 6, 1955.

OXNER, Justice.

This is an appeal from an order requiring appellant, W. F. Pendarvis, to specifically perform a contract to purchase from respondent, the Presbyterian Church of James Island, a corporation, Lot No. 131 in the Bay Front Subdivision on James Island, Charleston County. The lot mentioned is a part of a tract of land containing 100 acres which

was subdivided in 1945. The question presented is whether respondent acquired good title to said 100 acre tract. Appellant is willing to comply with his contract if he can obtain a good and marketable title to the lot which he agreed to purchase, but says that the property is subject to the trust hereinafter set forth. The facts were stipulated and are undisputed. The controversy relates to the proper legal conclusions to be drawn therefrom.

By an indenture or deed of May 9, 1713, Captain Jonathan Drake, in consideration of 150 pounds paid by the members of the Presbyterian Church on James Island, conveyed the 100 acre tract involved in this controversy to John Wilkins, William Wilkins, John Hearn and George Rivers for the sole use and benefit of every Presbyterian minister chosen by the members of said church to be their pastor, "for to reside, inhabit, possess and enjoy during such his Ministry". It is stated in the habendum that said trustees are to hold such property for "the use of all and every such Presbyterian Minister and successor which is or hereafter shall be nominated, elected and chosen by the persons who now are or hereafter shall be in communion with and members of the said Church on James Island or the major part of them there to inhabit, possess and enjoy during his or their continuance for his or their Ministry, and to none other use, trust or purpose whatsoever and it is intended, meant and agreed upon by and between the parties to these presents that to the end and intent that the lands and premises aforesaid may remain and continue in perpetual succession to every such Presbyterian Minister and his successor. * * *"

Provision was made in this instrument for filling vacancies upon the death of the trustees named therein. Those chosen to succeed them were to hold said property for the purposes and uses stated.

It clearly appears from the terms of this indenture that the members of the unincorporated society of Presbyterians

on James Island furnished the consideration for said conveyance, selected the trustees and retained the power to appoint their successors, and reserved the right to adopt "further convenants and conditions" to assure the possession and enjoyment of said property by their ministers.

It seems to be conceded that at the time said trust was established in 1713, it was not possible under existing law to incorporate this church. Doubtless the trust devise was then the most feasible method to accomplish the purposes stated in said instrument. Later, however, under the Constitution all denominations of Christian protestants were given equal religious and civil privileges and on petition to the Legislature allowed to incorporate. By Act adopted on March 17, 1785, 8 St. at L., page 127, respondent church, along with several other protestant churches therein named, was duly incorporated.

The surviving heirs of the original trustees, long since dead, are unknown. The record does not disclose whether any successor trustees were ever appointed. It appears that for a long number of years there was no occasion to provide a permanent manse or source of income as contemplated by the indenture of 1713, inasmuch as the ministers serving the church prior to 1796 were "supplied" by the Charleston Presbytery. It seems that at least from 1796, the church has almost continuously been served by a minister. However, the record does not show prior to 1873 how the regularly elected pastors were maintained or where they resided. In 1873, the respondent church purchased a house at Secessionville which was used as a manse until sold in 1918.

The record is silent as to the use made of the 100 acre tract prior to 1871. A recorded instrument shows that this property, "known as the parsonage", was on June 21, 1871 leased to H. B. Horlbeck for a term of five years at an annual rental of $504.00. The records of the historian of the church reveal that this tract was also known at the "Bermuda Farm", and in 1875 was leased by the church for 99 years to J. C. Clark, who moved to Atlanta in 1885. There-

after respondent leased the 100 acre tract for $450.00 per year, first to Elias Rivers and then to his son John Rivers, who occupied and farmed the property continuously until his death in 1941. The rents received were used by respondent for general church purposes.

The property first appears on the tax books of Charleston County in 1889. It was listed in the name of respondent and described as "Parsonage Farm"—"100 acres and eight buildings". It was continuously returned for taxation in a like manner until 1917. From that year until 1946 it was listed in the name of respondent and described simply as "100 acres, seven buildings." All taxes were paid by respondent's treasurer out of general church funds.

In 1939 respondent sold one acre for $1,000.00 and used the proceeds to repair the church property. In 1945, the members of the church decided to sell the remaining 99 acres. It was subdivided and thereafter over 100 lots were sold and conveyed. From the proceeds of sale, amounting to approximately $60,000.00, $15,000.00 was expended in building an appropriate manse for the minister and the remainder used for general purposes, including the repair and improvement of the church property. Until these lots were sold, the church was not in a financial condition to provide a residence for or pay the salary of a full time minister, but in recent years has been able to do so.

It thus affirmatively appears that since 1871 the 100-acre tract has been openly diverted from the uses stated in the indenture of 1713. For more than half a century respondent has had sole and uninterrupted possession, use and control of the property to the complete exclusion of all other persons whatsoever. It has managed the property as it has seen fit, and used the rents and profits, not according to the directions of the trust, but quite otherwise. All of this was done with the knowledge and acquiescence of the congregation and its ministers who regarded the property as being owned by respondent.

Although the indenture of 1713 was recorded in the Register's Office for Charleston County in 1732, its existence appears to have been either unkown or disregarded until shortly after the property was subdivided in 1945, when the record was discovered. It was then decided to remove any cloud on the title created by this instrument. For the purpose of instituting an appropriate action, trustees under the indenture were chosen on January 18, 1948, and shortly thereafter a suit was brought by respondent against the newly appointed trustees and the then minister for the purpose of having the church declared to be the owner in fee simple of all the property in said subdivision except the lots previously sold, with respect to which the Court was asked to confirm title in the purchasers. This action was referred to the Master for Charleston County who, after taking voluminous testimony, recommended that the relief asked by the church be granted. In a decree dated August 25, 1948, the report of the Master was confirmed. There was no appeal.

The instant action was brought against appellant on August 6, 1951. On appellant's motion, the recently appointed trustees under the indenture and the minister of the church were made parties defendant. The case was heard upon the pleadings, a stipulation of facts, and the testimony taken in the previous action. The Court below concluded that respondent could convey good title to the property and issued a decree of specific performance. This decision was based upon three grounds: (1) That the validity of respondent's title was concluded by the judgment in the previous case, which under the doctrine of *res judicata* constitutes a bar to the instant action; (2) that the original trust was executed by virtue of the act of the General Assembly adopted on March 17, 1785; and (3) that in any event, the trust cannot be enforced due to the lapse of time and that respondent has acquired good title by adverse possession, which appellant was bound to accept. From this decree only

Pendarvis, the purchaser under the contract which is sought to be specifically enforced, has appealed.

We are satisfied that a Court of Equity should not now undertake to enforce this ancient trust, which has long since been repudiated to the knowledge of all concerned, and that respondent has held the property adversely a sufficient length of time to acquire good title. This conclusion makes it unnecessary for us to pass upon the first two grounds upon which the Circuit Judge rested his decision.

It must be conceded that if respondent is regarded as a third party or stranger, its adverse use has continued a sufficient length of time to ripen into title. Appellant contends that when respondent was incorporated in 1785, title was vested in it as trustee for the purposes stated in the indenture of 1713 and that it has since continued as such fiduciary. It is, therefore, argued that its possession cannot be considered adverse and that respondent is seeking to annihilate the trust, which should not be tolerated. Assuming that the trust continued after respondent was incorporated and that title became vested in it as trustee, there is no showing that it has ever recognized the trust. The record is simply silent as to what, if anything, was done toward carrying out the trust, or what use was made of the property prior to 1871. However, during that year the act of respondent in leasing the 100-acre tract and using the rent for general church purposes was tantamount to a repudiation of the trust. Thereafter for a period of more than half a century respondent used the property for purposes at variance with those named in the trust instrument, dealt with it as if owned in fee simple, and its title was never questioned until shortly before the suit was brought in 1948. Its possession was exclusive, open, uninterrupted and hostile. These facts give rise to a presumption of extinguishment of the trust and that all necessary steps were taken to give valid title to respondent.

It is argued that due to the long lapse of time all parties, including the congregation and the ministers, had simply

forgotten the trust and under these circumstances, respondent's possession was not adverse. Not only was the record in the Register's office constructive notice of the trust, but, as stated in *Waterman Hall v. Waterman,* 220 Ill. 569, 77 N. E. 142, 145, 4 L. R. A., N. S., 776, "The possession of one claiming the exclusive ownership of land is adverse to all the world, and not merely adverse to those who know or claim that they have some title to the property. A person's possession of land is notice to all the world of his claim to possession of the same, and, if another person does not learn of his claim to possession until the bar of the statute of limitations has attached, it will be his own neglect and inattention, from which he can claim no immunity."

Where a trustee has repudiated his obligations as trustee, which need not be in specific words but may consist of conduct inconsistent with the existence of the trust, and holds adversely, a beneficiary with knowledge of the repudiation can no longer rely upon the trustee's continued performance of his duty. The beneficiary is then in a position similar to that of any other party who has an equitable claim against an adversary and may become barred by *laches* if he fails to proceed with reasonable diligence. See Restatement of Laws of Trusts, Section 219, and comments thereon. Our decisions are in accord with this view. In *State ex rel. Van Wyck v. Norris,* 15 S. C. 241, 257, the Court said: "The law is too well settled to make any reference to authority necessary, that when a trustee does an act which purports to be a termination of his trust, it gives currency to the statute from the time of such an act. * * * When the act purports to be a complete termination of the trust he henceforth holds adversely, and, at the end of the statutory period, all further account is barred."

In *Attorney General v. Federal Street Meeting House,* 3 Gray, Mass., 1, it was held that where a meetinghouse was conveyed to a prudential committee of a religious society in trust for a particular form of worship and the religious society incorporated and openly occupied the meetinghouse

for a different form of worship for forty years, a suit in equity to enforce the trust would be barred. The Court, in an opinion by Chief Justice Shaw, said:

"It is true, that in a direct question between trustees and *cestuis que* trust, the possession of the latter is the possession of the trustees, and cannot be adverse. But when another party, not acknowledging the trust, but denying that any such trust affecting the estate has been created, or asserting that it has been fully performed, or released or discharged, or otherwise does not exist, and claiming adversely both to trustee and *cestuis que* trust, such a possession is adverse; and if all those who would have a right to question it, lie by and acquiesce, during the time of limitation, the statute is a bar."

The instant case certainly comes within the following definition of "stale demand" found in 21 C.J., page 211, and quoted with approval in *Bell, Probate Judge v. Mackey,* 191 S. C. 105, 3 S. E. (2d) 816, 824: " ' "One that has for a long time remained unasserted; one that is first asserted after an unexplained delay of such great length as to render it difficult or impossible for the court to ascertain the truth of the matters in controversy and to do justice between the parties, or as to create a presumption against the existence or validity of the claim, or a presumption that it has been abandoned or satisfied." ' " See also 30 C.J.S., Equity, § 112.

The result is the same whether respondent be regarded as a stranger or whether, upon incorporation, the trust continued and respondent became trustee under the indenture of 1713. It we accept the former as the status, the property has been held adversely for a sufficient length of time to give respondent a good and marketable title. If we regard respondent as becoming trustee, there was a repudiation of the trust not later than 1871 and any action to enforce same has long since been barred.

Although this action is a "friendly" one, the questions involved have been vigorously and ably argued. The briefs filed are excellent and have been most helpful.

Affirmed.

BAKER, C. J., and STUKES, TAYLOR and LEGGE, JJ., concur.