595 S.E.2d 253

ALL SAINTS PARISH, WACCAMAW, a South Carolina non-profit corporation, a/k/a The Episcopal Church of All Saints and a/k/a The Vestry and Church Wardens of the Episcopal Church of All Saints Parish, and Martha M. Lachicotte, Frances Ward Cromwell, and Alberta Lachicotte Quattlebaum, Individually and as Representatives of the Inhabitants of the Waccamaw Neck Region in Georgetown County, and Evelyn LaBruce, Individually and as descendant of George Pawley, Plaintiffs,

Of Whom All Saints Parish, Waccamaw, a South Carolina non-profit corporation, a/k/a The Episcopal Church of All Saints and a/k/a The Vestry and Church Wardens of the Episcopal Church of All Saints Parish are Respondents,

v.

THE PROTESTANT EPISCOPAL CHURCH IN THE DIOCESE OF SOUTH CAROLINA, The Episcopal Church a/k/a The Protestant Episcopal Church in the United States of America, Mark Sanford, in his official capacity as the Governor of South Carolina, State of South Carolina and John Doe and Jane Doe as descendants to George Pawley and William Poole, Defendants,

Of Whom the Protestant Episcopal Church in the Diocese of South Carolina, The Episcopal Church a/k/a The Protestant Episcopal Church in the United States of America are Appellants

and

Mark Sanford, in his official capacity as the Governor of the State of South Carolina, State of South Carolina and John Doe and Jane Doe as descendants to George Pawley and William Poole are Respondents.

No. 3757.

Court of Appeals of South Carolina.

Heard Sept. 10, 2003.

Decided March 8, 2004.

Withdrawn, Substituted and Refiled April 23, 2004.

Rehearing Denied April 23, 2004.

Benj. Allston Moore, Jr., Julius H. Hines and Coming B. Gibbs, Jr., all of Charleston, for Appellants.

Attorney General Henry D. McMaster, Chief Deputy Attorney General John W. McIntosh, Deputy Attorney Treva Ashworth, Senior Assistant Attorney General C. Havird Jones, Jr., all of Columbia; Fred B. Newby and Henrietta U. Golding, both of Myrtle Beach, for Respondents.

HOWARD, J.:

This is a suit involving All Saints Parish, Waccamaw ("the Parish"), the Protestant Episcopal Church in the Diocese of South Carolina ("the Diocese"), the Protestant Episcopal Church in the United States of America ("the National Church"), and the descendants of the trustees ("the Does") to determine who owns real and personal property located on Pawley's Island, South Carolina.

In 1745, a trust was created for the "Inhabitants On Waccamaw Neck for the Use of a Chapple or Church for divine worship of the Church of England established by Law." The trust was not recorded until 1767, the same year the Parish was recognized by the colonial government. During the next 100 years, the Parish became affiliated with the Diocese and the National Church.

In September 2000, after an ecclesiastical dispute arose between the Parish, the Diocese, and the National Church, the Bishop of the Diocese filed a notice with the Register of Deeds in Georgetown County, stating the Diocese and the National Church held an interest in the property by means of church canons. The Parish filed suit to have the statement removed from the deed book and to have the circuit court declare the Parish to be the sole owner of all real and personal property.

Because of the existence of the trust deed, the circuit court appointed a guardian *ad litem* to represent any interest the Does might have in the property. The Does moved for partial summary judgment, alleging they owned legal title to the real property. Based on the Parish's affiliation with the Diocese and the National Church, the Diocese and the National Church claimed an interest in the property by means of the Statute of Uses, adverse possession, laches, and staleness.

The circuit court ruled for the Does on the motion for summary judgment, finding the Does held legal title to the real property. The Diocese and the National Church appeal. We vacate in part, reverse in part, and remand.

## FACTUAL/PROCEDURAL BACKGROUND

The property at issue in this case is located in Georgetown County, in an area known as the Waccamaw Neck region. In 1745, Percival Pawley and his wife conveyed the property [1] to two trustees, George Pawley and William Poole, "in Trust For The Inhabitants On Waccamaw Neck for the Use of a Chapple or Church for divine worship of the Church of England established by Law."

In 1767, the General Assembly passed an act creating the Parish in the "Waccamaw Neck" region and appointing seven men to serve as commissioners for the Parish.[2] *See* Act No. 961 of May 23, 1767, 4 Stat. 266. That same year, the 1745 trust deed was recorded in Charleston County.

Although the charter was renewed on several occasions,[3] in 1902 the Parish became concerned that its charter had "probably long since expired," vesting its property with the Diocese.[4]

---

1. The Pawleys received the property from John Hutchinson's widow in 1731. John Hutchinson received the property in 1711 as a land grant from the Lords Proprietors. *See Coburg Dairy v. Lesser*, 318 S.C. 510, 512 n. 1, 458 S.E.2d 547, 548 n. 1 (1995) ("From 1672 until 1730, grants of land were made by the Lords Proprietors who were granted enormous tracts of land in America by Charles II, King of England. The Lords Proprietors owned all of Carolina and acted in the stead of the sovereign in making land grants.").

2. In 1770, the Royal Privy Council disallowed the Parish's colonial charter. However, in 1778, the Parish was recognized by the government of the newly formed state of South Carolina. *See* Act No. 1071 of Mar. 16, 1778, 4 Stat. 407; S.C. Const. of 1778, arts. XII–XIII.

3. In 1839, the original Parish charter was "revived" for a fourteen-year term. *See* Act No. 2788 of December 21, 1839, 11 Stat. 70. The charter was renewed for an unspecified term in 1852. *See* Act No. 4081 of December 16, 1852, 12 Stat. 137.

4. According to an 1880 statute, title to "all property belonging to any of the corporations or churches or dormant parishes formerly connected with the [Episcopal Church for the South Carolina Diocese], but which have now ceased to have active operation ... or whose charters of

To remedy this situation, the Chancellor of the Diocese suggested the Parish apply to the South Carolina Secretary of State for a corporate charter and request a quitclaim deed from the Diocese. Later that same year, the Parish received its certificate of incorporation from the Secretary of State. In 1903, the trustees of the Diocese executed a quitclaim deed that relinquished title of the property to the Parish.

Subsequent to the recording of this deed, the Parish leased parts of the property for uses not authorized by the trust and mortgaged the property.[5]

In September 2000, after an ecclesiastical dispute arose involving the Parish, the Diocese, and the National Church, the Bishop of the Diocese issued a notice setting forth the canons of the Diocese and the National Church that limit the alienation and encumbrance of church property. This notice was recorded in the public records of Georgetown County.

In response to the recording of this notice, the Parish filed a complaint in October 2000, seeking a removal of the notice from the deed book and a declaration that it owned the real and personal property located on Pawley's Island. The Diocese and the National Church answered and counterclaimed, alleging the property was owned by the Parish subject to the canons of the Diocese and the National Church.

The Parish requested the court appoint a guardian *ad litem* to represent the interests of John and Jane Doe, the representatives of the descendants to the original trustees of the 1745 trust.

After the circuit court appointed a guardian *ad litem* to represent the Does, the Does petitioned for partial summary judgment on the issue of the ownership of the real property, arguing they were the sole owners of the real property. Thereafter, the Parish aligned itself with the Does' position.[6]

---

incorporation may have expired" vested in the Diocese. *See* Act No. 222 of Feb. 20, 1880, 17 Stat. 257.

5. The Diocese authorized these mortgages.

6. The Parish also filed a motion for summary judgment asking the circuit court to declare "the subject property [was] governed by the 1745 Trust Deed, and as a matter of law [the Diocese] and [the National Church] have no right to assert any interest in the said property." The

At the hearing, the Diocese and the National Church defended against the Does' claim,[7] maintaining the position that the Parish owned the real property and they owned an interest in any property owned by the Parish.

After hearing extensive argument on the Does' motion for summary judgment, the circuit court concluded the language contained in the 1745 trust deed was clear and unambiguous and therefore refused to consider parol evidence to explain the terms in the trust deed. The circuit court granted the Does' motion for partial summary judgment, ruling "the 1745 Deed created an active valid and binding charitable trust and legal title to the Subject Property is held by the common law heirs of George Pawley represented by John Doe and Jane Doe, and the equitable title is held by the inhabitants of the Waccamaw Neck as the Trust beneficiaries." In making its ruling, the circuit court determined: 1) the Diocese and the National Church did not have standing to assert Statute of Uses, adverse possession, laches, and staleness; 2) the Statute of Uses did not execute the trust; 3) the trust did not fail when the Church of England ceased to be recognized in the United States; 4) the Parish did not acquire the property by adverse possession; 5) the Does' claim was not barred by laches; 6) the Does' claim was not barred by staleness; 7) the Diocese and the National Church were "at best, incidental beneficiaries" to the trust; and 8) the court did not have subject matter jurisdiction to determine the ownership of the personal property. The Diocese and the National Church appeal.

## ISSUES PRESENTED

1. Did the circuit court err by holding the Diocese and the National Church did not have standing to assert Statute of Uses, adverse possession, laches, and staleness?

2. Did the circuit court err by ruling on summary judgment that the Statute of Uses did not execute the trust?

---

circuit court declined to rule on the Parish's motion because of its disposition on the Does' motion.

7. Neither the Diocese nor the National Church filed a cross-motion for summary judgment.

3. Did the circuit court err by ruling on summary judgment that the trust did not fail when the Church of England ceased to be recognized in the United States?

4. Did the circuit court err by granting summary judgment to the Does on the claim of adverse possession?

5. Did the circuit court err by granting summary judgment to the Does on the claim of laches?

6. Did the circuit court err by granting summary judgment to the Does on the claim of staleness?

7. Did the circuit court lack subject matter jurisdiction to declare the Diocese and the National Church to be incidental beneficiaries of the trust?

8. Did the circuit court err by declaring it did not have subject matter jurisdiction to determine the ownership of the personal property?

## LAW/ANALYSIS

### I. Standing

■ The Diocese and the National Church argue the circuit court erred by holding they did not have standing to assert Statute of Uses, adverse possession, laches, and staleness. We agree.

■ A party must have a personal stake or interest in the subject matter of the lawsuit to have standing. *Anchor Point v. Shoals Sewer*, 308 S.C. 422, 428, 418 S.E.2d 546, 549 (1992) (holding a party has standing to sue if the party has "a real, material, or substantial interest in the subject matter of the action, as opposed to ... only a nominal or technical interest in the action"); *Duke Power v. South Carolina Pub. Serv. Comm'n*, 284 S.C. 81, 96, 326 S.E.2d 395, 404 (1985) ("[T]o have standing to present a case before the courts of this State, a party must have a personal stake in the subject matter of the lawsuit."); *see Town of Sullivan's Island v. Felger*, 318 S.C. 340, 346, 457 S.E.2d 626, 629 (Ct.App.1995) (holding the town has standing in a declaratory action to determine whether Felger owns fee simple title to the property, even though the town does not have a direct interest in ownership of the property).

■ The present lawsuit began as an action with the Parish as plaintiff and the Diocese and the National Church as co-defendants. The Parish initiated the lawsuit after the Bishop of the Diocese filed a notice in the County of Georgetown Deed Book, claiming the Diocese and National Church hold an interest in any property owned by the Parish based on the canons of the Diocese and the National Church.[8] In its complaint, the Parish requested the circuit court declare it to be the sole owner of the property.

Because the Parish requested it be declared the sole owner of the property and did not simply ask the circuit court to determine the claims between the Parish, the Diocese, and the National Church, the circuit court heard arguments for the appointment of representatives for anyone having an interest in the property. The circuit court appointed the Does to represent the claim of the descendants of the trustees to the 1745 trust.

After being appointed, the Does moved for partial summary judgment, claiming they alone held legal title to the real property. The Parish supported this motion. Unless the

---

8. The quoted language from the canons of the Diocese read, in part, "[a]ll real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for the Episcopal Church and the Protestant Episcopal Church in the Diocese of South Carolina." The quoted language from the canons of the National Church was nearly identical. Although the Parish claims it is not bound by these canons, the Parish does not deny it has been affiliated with the National Church since as early as 1820 and with the Diocese since at least 1903. We note the interpretation of the canons is an ecclesiastical dispute and beyond the jurisdiction of the civil court. *See Fire Baptized Holiness Church of God of Americas v. Greater Fuller Tabernacle Fire Baptized Holiness Church*, 323 S.C. 418, 421–23, 475 S.E.2d 767, 769–70 (Ct.App.1996) ("The trial court ... found that the issue of whether the 1975 deed comported with Church discipline so as to effectively transfer the subject property to the National Church was ecclesiastical in nature, and therefore beyond the jurisdiction of the civil court.... [In affirming the trial court's decision, this Court stated], [t]he interpretation of the Discipline, and what it mandates, is a matter for the ecclesiastical tribunal of the National Church, not the civil court."); *see also Seldon v. Singletary*, 284 S.C. 148, 149–50, 326 S.E.2d 147, 148–49 (1985) (holding a local congregation that is part of a hierarchical church is under the government and control of the religious organization); *Morris Street Baptist Church v. Dart*, 67 S.C. 338, 343, 45 S.E. 753, 754 (1903) ("Episcopalians subject themselves, in church affairs, to the authority of synods and councils.").

Diocese and the National Church are able to assert the Parish owns the real property, their claim to an interest in the property will be lost based solely on the Parish's decision not to pursue the issue. Thus, the Diocese and National Church have a stake in any lawsuit that could affect the Parish's interest in the property.

Therefore, the circuit court erred by ruling the Diocese and the National Church did not have standing to assert Statute of Uses, adverse possession, laches, and staleness. Consequently, we reverse.

## II. Summary Judgment

### Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP.

"In determining whether any triable issues of fact exist, the evidence and all inferences which can be reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party." *Strother v. Lexington County Recreation Comm'n*, 332 S.C. 54, 61, 504 S.E.2d 117, 121 (1998). "If triable issues exist, those issues must go to the jury." *Rothrock v. Copeland*, 305 S.C. 402, 405, 409 S.E.2d 366, 367 (1991).

"An appellate court reviews a grant of summary judgment under the same standard applied by the trial court pursuant to Rule 56, South Carolina Rules of Civil Procedure." *Lanham v. Blue Cross & Blue Shield of South Carolina*, 349 S.C. 356, 361, 563 S.E.2d 331, 333 (2002).

### A. Statute of Uses

The Diocese and the National Church argue the circuit court erred by ruling on summary judgment that the Statute of Uses did not execute the trust. We agree.

■ In a trust where the trustee is instructed to use the property for the benefit of another, the Statute of Uses executes to vest legal title with the beneficiary, if the benefi-

ciary is capable of taking legal title and the trustee has no active duties. Restatement (Second) of Trusts § 67 (1959); *see id.* at cmt. b ("When the Statute of Uses executes a use or trust not only is the interest of the beneficiary made legal but the interest of the person who otherwise would hold subject to the use or trust is extinguished. The Statute thus has a double effect in turning the equitable interest of one person into a legal interest and extinguishing the legal interest of the other."); *Johnson v. Thornton,* 264 S.C. 252, 257, 214 S.E.2d 124, 127 (1975) ("In a passive trust the legal and equitable titles are merged in the beneficiaries and the beneficial use is converted into legal ownership, but as to an active trust the title remains in the trustee for the purpose of the trust."); *see also Young v. McNeill,* 78 S.C. 143, 153, 59 S.E. 986, 989 (1907) (holding the Statute of Uses will not execute the trust if the beneficiary of the trust is not capable of taking legal title); *Bowen v. Humphreys,* 24 S.C. 452, 455 (1886) (holding the Statute of Uses will not execute the trust "as long as there is anything remaining for the trustee to do which renders it necessary that he should retain the legal title in order fully to perform the duties imposed upon him by the trust").

The Does argued the Statute of Uses did not execute the trust. According to the Does, the plain language of the trust deed established the beneficiary was not capable of taking legal title, and the trustee had active duties.

██ The circuit court agreed with the Does, ruling the term "inhabitants on Waccamaw Neck" referred to the people living in the geographic region and ruling the language in the deed imposed an affirmative duty upon the trustees to assure "continued use of the property for a chapel or church and to ensure that divine worship [was] maintained." [9]

---

9. In finding the settlor's intent was to ensure the property was used for divine worship, the circuit court ignored the words "Church of England established by Law." Because this language revealed the settlor's intent to use the property to house a chapel for a specific denomination of the Christian faith, we hold the circuit court erred in this ruling. *See First Carolinas Joint Stock Land Bank v. Deschamps,* 171 S.C. 466, 480, 172 S.E. 622, 627 (1934) ("In view of the . . . provisions of the trust deed and of the decisions cited, . . . . [t]his construction gives full effect to the intention as expressed in every part of the deed."); *Town of Pawlet v. Clark,* 9 Cranch 292, 13 U.S. 292, 324, 3 L.Ed. 735 (1815) (holding the interpretation of a grant must "give full effect to all the words" in the

Because of these rulings, the circuit court refused to consider parol evidence regarding the issues of whether the beneficiary was capable of taking legal title and whether the trustee lacked affirmative duties.

▮▮▮ "The primary consideration in construing a trust is to discern the settlor's intent." *Bowles v. Bradley*, 319 S.C. 377, 380, 461 S.E.2d 811, 813 (1995). When the beneficiary "is described in terms applicable . . . to more than one person or thing, [parol] evidence is admissible to prove which of the persons or things so described was intended." [10] *Cunningham v. Cunningham*, 20 S.C. 317, 330 (1884) (quoting James Wigram & John O'Hara, *A Treatise on Extrinsic Evidence in Aid of the Interpretation of Wills* 142 (1872)); *see Bowles*, 319 S.C. at 380, 461 S.E.2d at 813 ("[W]hen there is no defect on the face of a document but an uncertainty appears upon attempting to effectuate the document, then the document contains a latent ambiguity and parol evidence is admissible to determine the settlor's intent."). Furthermore, the evidence must be considered in light of the law as it existed at the time. *See id.* (holding it was proper to review the case law applicable to the time when the settlor wrote his trust deed to determine "issue" had only one legal interpretation at the time, meaning no latent ambiguity existed).

In adopting the Does' argument, the circuit court ignored the argument of the Diocese and the National Church that "Inhabitants on Waccamaw Neck" referred to the Parish. According to the Diocese and the National Church, the settlor intended to deed the property to the Parish but could not do

---

document); *see also Combe v. Brazier*, 2 S.C. Eq. 431, 446–47, 2 Des. Eq. 431, 446–47 (1806) (holding that because there are "slight shades of difference between the different sects of protestant Christians," a trust deed which provided for a Methodist minister to preach at a church failed when the minister became an Episcopal priest).

10. The law relating to discerning the drafter's intent is identical for wills and trusts. *See Deschamps*, 171 S.C. at 480, 172 S.E. at 627 (holding courts are authorized to ascertain a maker's intent in the construction of wills and trust deeds); *South Carolina Nat'l Bank v. Bonds*, 260 S.C. 327, 331–32, 195 S.E.2d 835, 837 (1973) ("In construing the terms used by the Testator in his will, the paramount consideration of this Court is to ascertain and effectuate the intent of the Testator."); *Bowles*, 319 S.C. at 380, 461 S.E.2d at 813 ("The primary consideration in construing a trust is to discern the settlor's intent.").

so directly until such time as the church was officially recognized by the government. Based on this argument, the Statute of Uses executed the trust once the Parish was officially established, meaning the trustees had no continuing duties.[11]

To advance their point, the Diocese and the National Church offered parol evidence, statutes, cases, and constitutions to demonstrate that in colonial times churches could not be recognized by the government until they owned property, and they could not own property until they had been officially recognized. *See Pawlet*, 13 U.S. at 330 (holding "no parish church . . . could have a legal existence until consecration and consecration was expressly inhibited unless upon a suitable endowment of land"). As such, a colonial practice arose in which a settlor placed property in trust for a congregation until such time as the government recognized the church. *See id.* at 331 ("[I]t would form an exception to the generality of the rule, that to make a grant valid there must be a person *in esse* capable of taking it. And under such circumstances until a parson should be legally inducted to such new church, the fee of its lands would remain in abeyance."). The Diocese and the National Church argued this practice was followed by the settlor as evidenced by the fact that the trust was not recorded until the year the Parish was recognized by the government, approximately twenty years after the trust was created.

Because uncertainty arose when attempting to effectuate the trust deed, we hold "inhabitants on Waccamaw Neck" was a latent ambiguity, and it was error for the circuit court to refuse to consider parol evidence, statutes, cases, and constitutions in determining whether the beneficiary was capable of taking legal title and whether the trustees lacked affirmative duties.[12] *See Bowles*, 319 S.C. at 380, 461 S.E.2d

---

11. Because the Royal Privy Council disallowed the 1767 Act creating the Parish in 1770, the Diocese and the National Church raise the possibility that the property may have escheated to the government three years after vesting with the Parish. Because we remand this case in full, we need not further address this issue.

12. The circuit court relied on *Beckham v. Short*, 298 S.C. 348, 349–50, 380 S.E.2d 826, 827 (1989), to support the proposition that parol evidence is inadmissible to vary the terms of a deed in the absence of fraud, mistake, or other grounds for reformation or rescission. Because the Diocese and the National Church sought to introduce the

at 813 ("[W]hen there is no defect on the face of a document but an uncertainty appears upon attempting to effectuate the document, then the document contains a latent ambiguity and parol evidence is admissible to determine the settlor's intent.").

When the parol evidence is considered, there is at least a genuine issue of material fact as to the meaning of "inhabitants on Waccamaw Neck." Therefore, the circuit court erred by ruling on summary judgment that the Statute of Uses did not execute the trust. *See George v. Fabri*, 345 S.C. 440, 452, 548 S.E.2d 868, 874 (2001) ("The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder.").

## B. Failure of the Trust[13]

The Diocese and the National Church argue the circuit court erred by ruling on summary judgment that the trust did not fail when the Church of England ceased to be recognized in the United States.[14] We agree.

"Charitable trusts are entitled to peculiar favor; the courts will construe them to give them effect, if possible, and to carry out the general intention of the donor." *Colin McK.*

---

parol evidence to explain the term, not to vary it, we hold the circuit court erred in its reliance on *Beckham*. *See Shelley v. Shelley*, 244 S.C. 598, 606, 137 S.E.2d 851, 855 (1964) (" '[E]vidence is admissible which merely intends to explain and apply what the testator has written.' " (quoting *McCall v. McCall*, 25 S.C. Eq. 447, 456, 4 Rich. Eq. 447, 456 (1852))).

13. The Does and the National Church assert this argument only if, upon remand, the Statute of Uses is determined not to execute the trust in a subsequent circuit court proceeding. If the Statute of Uses executed the trust in 1767, the possibility that the trust failed in the 1770s as a result of the disestablishment of the Church of England in the United States is irrelevant.

14. As part of its ruling, the circuit court concluded the trust did not fail when the Church of England ceased to be recognized as the official church in the United States. The Diocese and the National Church argued against this ruling, alleging the trust failed once the Church of England was no longer "established by law" as required by the language of the trust. The Diocese and the National Church make this argument in connection with their assertion that the Parish holds the property by adverse possession.

*Grant Home v. Medlock,* 292 S.C. 466, 470, 349 S.E.2d 655, 657 (Ct.App.1986).

▇ "Although a court has considerable discretion to adapt a trust to changed circumstances, this flexibility is not unlimited." *Id.* at 471, 349 S.E.2d at 658; *see Bonds,* 260 S.C. at 337, 195 S.E.2d at 840 ("[T]here is no question that where conditions have substantially changed, the Court is allowed considerable discretion [in trying to effectuate the intent of the testator]."); *Furman Univ. v. McLeod,* 238 S.C. 475, 490, 120 S.E.2d 865, 872 (1961) ("[T]he Court of Equity has the power upon a proper showing, to permit a deviation from the strict terms of a trust if necessary or advisable to carry out the purposes thereof.").

▇ A court is authorized to deviate from the terms of a trust to carry out the settlor's intent but is prohibited from applying the trust property to a different charitable purpose from that designated by the terms of the trust. *Bonds,* 260 S.C. at 337–41, 195 S.E.2d at 840–42; *see id.* at 341–42, 195 S.E.2d at 842–43 ("[T]he Testator's primary purpose was to create a perpetual memorial ... by aiding deserving high school graduates in pursuit of their education.... With the many changes which have taken place since the Testator's death ... it is obvious that if the terms of the trust were literally complied with and the beneficiaries limited to the graduates of 'Greenville City High Schools,' the Testator's main purpose would be defeated rather than effectuated."); *McLeod,* 238 S.C. at 489, 120 S.E.2d at 871–73 (holding the circuit court was authorized to deviate from the strict terms of the trust because the intent of the testator was to benefit the school); *Pringle v. Dorsey,* 3 S.C. 502, 507–09 (1872) (holding the trust was for the benefit of a particular church that was subsequently destroyed by fire, and no departure from the trust was authorized because no evidence suggested the testator indicated any organization other than the particular church was to benefit from the trust); *Attorney Gen. v. Jolly,* 21 S.C. Eq. 379, 394–96, 2 Strob. Eq. 379, 394–96 (1848) (holding the income of a trust could not be diverted from a particular congregation to the national church, when the testator specifically requested the money be given to the congregation).

We find *Bonds* instructive on this point. In *Bonds*, a Greenville County resident created a trust whose income was "to be used for assistance of deserving students of Greenville City High Schools in completing their education." *Bonds*, 260 S.C. at 330, 195 S.E.2d at 836. When the document was written in 1941, two Greenville City High Schools existed. By the time the trust became effective in 1971, one of these high schools had been destroyed by fire and students were bused throughout the consolidated Greenville County school system to achieve racial integration. As a result, students who would have been eligible for trust proceeds in 1941 did not qualify in 1971 and vice versa. *Id.* at 330–36, 195 S.E.2d at 836–39. In determining whether the trust failed, our supreme court stated that because "a change in conditions which the Testator could not have reasonably anticipated" occurred, the application of the trust language to the "factual situation [as it existed in 1971] result[ed] in certain latent ambiguities and uncertainties." *Id.* at 336, 332, 195 S.E.2d at 839, 838. Thus, our supreme court concluded it was proper to admit parol evidence to determine if the intent of the testator could be carried out with a deviation from the literal words of the trust or if the change of circumstances meant that the purpose of the trust had been frustrated. *Id.* at 331–342, 195 S.E.2d at 837–43.

Similarly, in the present case, the trust required the property be used to house a chapel for worship of the "Church of England established by Law." When the settlor wrote this term in 1745, there was no ambiguity as to the meaning of the term. The term referred to the state church of England which was recognized by the ruling authorities of the American colonies. However, after the formation of the United States, both the national constitution and state constitution disallowed the establishment of a state-sponsored church. *See* U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."); S.C. Const. art. I, § 2 ("The General Assembly shall make no law respecting an establishment of religion or prohibiting the free exercise thereof.").

Thus, a latent ambiguity arose once the Church of England ceased to be recognized in the United States. Therefore, the circuit court erred by refusing to consider parol evidence

concerning the legal successor of the Church of England in the United States. *See Bonds,* 260 S.C. at 332, 195 S.E.2d at 838 (holding "the application of [the trust] language to the current factual situation result[ed] in certain latent ambiguities and uncertainties"); *cf. Pawlet,* 13 U.S. at 323–36 (holding the court should consider common law, statutes, and historical material in determining whether a charter grant of "one share for a glebe [15] for the church of England as by law established" was either void or devolved to the state after the American Revolution).

■ When the parol evidence is considered, there is at least a genuine issue of material fact as to whether the trust failed when the "Church of England established by law" ceased to exist in the United States. Thus, the circuit court erred by granting summary judgment to the Does on this issue. *See George,* 345 S.C. at 452, 548 S.E.2d at 874 ("The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder.").

## C. Adverse Possession
### i. Evidence of Adverse Possession

■ The Diocese and the National Church argue the circuit court erred by granting summary judgment to the Does on the claim of adverse possession because ample evidence was presented that the Parish had adversely possessed the property in excess of forty years. We agree.

■ "To constitute adverse possession, the possession must be continuous, hostile, open, actual, notorious and exclusive for . . . [the required] statutory period." *Davis v. Monteith,* 289 S.C. 176, 180, 345 S.E.2d 724, 726 (1986).

Where the party claims the property under color of title, the statutory period is forty years. S.C.Code Ann. § 15–3–380 (1977) ("No action shall be commenced in any case for the recovery of real property or for any interest therein against a person in possession under claim of title by virtue of a written instrument unless the person claiming, his ancestor or grant-

---

**15.** A glebe is the "[l]and possessed as part of the endowment or revenue of a church or ecclesiastical benefice." *Black's Law Dictionary* 698 (7th ed.1999).

or, was actually in the possession of the same or a part thereof within forty years from the commencement of such action. And the possession of a defendant, sole or connected, pursuant to the provisions of this section shall be deemed valid against the world after the lapse of such a period."); *see Black's Law Dictionary* 260 (7th ed.1999) (stating color of title is "a written instrument or other evidence that appears to give title, but does not do so").

In 1903, the Diocese presented the Parish with a quitclaim deed to the property. At least from 1903 to the filing of the lawsuit in 2000, the Parish continually possessed the property at issue in this case.[16] During this period, the Parish built structures on the property, improved the property, and sold burial plots from the property. Additionally, the Parish mortgaged the property on four separate occasions from 1959 to 1993. On each occasion, the Parish represented to the lender that it held fee simple title to the property.[17] *See Miller v. Leaird*, 307 S.C. 56, 62, 413 S.E.2d 841, 844 (1992) (holding evidence of adverse possession included mortgage payments paid on the property, taxes paid on the property, and boundary lines marked on the disputed property); *see also First Baptist Church of Woodruff v. Turner*, 248 S.C. 71, 81, 149 S.E.2d 45, 49 (1966) (" 'The giving of a deed or mortgage by one in possession of land is ordinarily evidence of assertion of title.' " (quoting *Carr v. Mouzon*, 86 S.C. 461, 467, 68 S.E. 661, 663 (1910))).

Thus, the Diocese and the National Church presented ample evidence that the possession by the Parish was continuous, hostile, open, actual, notorious, and exclusive from at least 1903 to 2000, a period of nearly 100 years. *See Presbyterian Church of James Island v. Pendarvis*, 227 S.C. 50, 57, 86 S.E.2d 740, 743 (1955) (holding evidence of adverse possession included the church's dealings with the property as if it owned the property in fee simple for a period of more than half a

---

16. The Parish began possession of the property once it was chartered in 1767. There is some dispute as to whether the Parish existed continuously from 1767 to 1903. Because our analysis on adverse possession is not affected by the events of this time period, we decline to comment on this issue.

17. On each occasion, the Parish obtained permission from the Diocese, as required by the canons of the Diocese and the National Church.

century, and the fact that the church's title had not been questioned for approximately fifty years). Viewing the evidence in the light most favorable to the Diocese and the National Church, there is at least a genuine issue of material fact as to whether the Parish had adversely possessed the property for at least forty years. Therefore, the circuit court erred by granting summary judgment in favor of the Does on this issue. *See George,* 345 S.C. at 452, 548 S.E.2d at 874 ("The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder.").

### ii. Requirement of Hostile Possession

The Diocese and the National Church argue the circuit court erred by ruling on summary judgment that the Parish was not in hostile possession of the property. We agree.

Hostile possession is "possession asserted against the claims of all others." *Black's Law Dictionary* 1184 (7th ed.1999).

An adverse possession claim fails if the claimant's possession is not hostile. *Perry v. Heirs at Law and Distributees of Gadsden,* 316 S.C. 224, 225, 449 S.E.2d 250, 251 (1994).

In the present case, the circuit court cited *Cook v. Eller,* 298 S.C. 395, 397, 380 S.E.2d 853, 854 (Ct.App.1989), for the proposition that possession cannot be hostile if based on a mistaken belief of ownership.

Our supreme court stated the rule that "possession under a mistaken belief that property is one's own and with no intent to claim against the property's true owner cannot constitute hostile possession ... is applicable only to cases involving boundary disputes between adjoining landowners." *Perry,* 316 S.C. at 226, 449 S.E.2d at 251; *see Pendarvis,* 227 S.C. at 57–58, 86 S.E.2d at 743 (holding a party's possession was adverse even when "due to the long lapse of time all parties, including the congregation and the ministers, had simply forgotten the trust").

Because the dispute in this case concerns the entire piece of property and is not merely a boundary dispute, the

circuit court erred by applying *Cook.*[18]

As an additional ground for finding the Parish's possession was not hostile, the circuit court cited *Frady v. Ivester,* 118 S.C. 195, 205, 110 S.E. 135, 138 (1921), for the proposition that one who enters property based on permissive use may not fulfill the hostility requirement of adverse possession.[19]

Although our supreme court noted a party cannot adversely possess property used with the permission of the owner, it stated a party may adversely possess such property upon a clear disclaimer of the owner's title. *Monteith,* 289 S.C. at 180, 345 S.E.2d at 726; *see Young v. Nix,* 286 S.C. 134, 136, 332 S.E.2d 773, 774 (Ct.App.1985) ("Where one enters land under permission from the title holder, the possession can never ripen into an adverse title unless a clear and positive disclaimer of the title under which entry was made is brought home to the other party.").

The actions of the Parish from at least 1903 to 2000, including leasing the property for uses not permitted by the trust and mortgaging the property, could not have been based on the permission of the trustees because no additional trustees were appointed after the death of the last trustee in 1774. Further, none of the four mortgages taken out by the Parish made reference to any ownership interest related to the 1745 trust.[20] Thus, the circuit court erred in applying *Frady* to these facts.

Viewing the evidence in the light most favorable to the Diocese and the National Church, there is at least a genuine issue of material fact as to whether the Parish fulfilled the hostility requirement for adverse possession. Thus, the cir-

---

18. Although the Parish admits it was not aware of the trust until 1986, the deed was properly recorded in 1767 and remained on record from that time. Thus, the Parish had constructive notice of the trust. *Pendarvis,* 227 S.C. at 57–58, 86 S.E.2d at 743 (holding the parties had constructive notice of the 1713 trust because it was recorded in the office of the Register of Deeds in 1732).

19. Even *Frady* does not preclude a party whose possession began under permissive use from adversely possessing the property, so long as the party "either surrendered the possession or gave notice of an adverse possession." *Id.*

20. *See* footnote 17, *supra.*

cuit court erred by granting summary judgment to the Does on this issue. *See George,* 345 S.C. at 452, 548 S.E.2d at 874 ("The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder.").

### iii. Repudiation of the Trust by a Beneficiary or a Trustee[21]

■ The Diocese and the National Church argue the circuit court erred by ruling on summary judgment that the Parish had not repudiated the trust. We agree.

■ In a claim for adverse possession "where one's possession was begun in privity with or in subservience to the title of another," adverse possession cannot begin until the trust is openly repudiated by "a clear, positive, and continued disclaimer of the title ... [and the adverse claim is] brought home to the other party." *Bradley v. Calhoun,* 125 S.C. 70, 82, 117 S.E. 811, 815 (1923); *cf. Ham v. Flowers,* 214 S.C. 212, 218–19, 51 S.E.2d 753, 756 (1949) (holding when a party took possession of property to protect his interest as a mortgagee, that party entered "the premises in the quasi character of trustee for the mortgagor and [could] not hold adversely to [mortgagor's] rights until he distinctly disavows and repudiates his mortgagee relationship and notice thereof is brought home to the mortgagor").

■ Repudiation "need not be in specific words but may consist of conduct inconsistent with the existence of the trust." *Pendarvis,* 227 S.C. at 57–58, 86 S.E.2d at 743–44 (holding the party's leasing the property and using the property in a manner not consistent with the trust was "tantamount to a repudiation of the trust").

Although the factual situations in *Calhoun, Ham,* and *Pendarvis* involved trustees adversely possessing against the trust, "[t]he same requirements logically apply to the possession by a beneficiary." *See Reasor v. Peoples Fin. Servs.,* 276 Ga. 534, 579 S.E.2d 742, 744 (2003) (holding a trustee or a

---

21. The Diocese and National Church assert this argument only if the Parish is determined to be the beneficiary of the trust during a subsequent circuit court proceeding or the Parish is determined to be the trustee of the trust in a subsequent probate court proceeding. *See* S.C.Code Ann. § 62–7–201(a)(1) (Supp.2002) (stating the probate court has exclusive jurisdiction to appoint trustees).

beneficiary may adversely possess against the trust by denying the trust and possessing in a continuous, hostile, open, actual, notorious, and exclusive manner); *see also Lewis v. Hawkins*, 23 Wall. 119, 90 U.S. 119, 126, 23 L.Ed. 113 (1874) (holding a beneficiary can adversely possess against the trust if a distinct denial of the trust or a possession inconsistent with it is clearly shown).

In 1947, the Parish leased portions of the property for uses not authorized by the trust. This act constituted evidence of repudiation. *See Pendarvis*, 227 S.C. at 57–58, 86 S.E.2d at 743–44.

From 1959 to 1993, the Parish mortgaged the property at least four times, each time listing itself as the owner of the property.[22] Because neither the language of the trust nor an order of the probate court authorized such action, mortgaging the property was additional evidence of repudiation. *See* 27 S.C. Jur. *Mortgages* § 12(i) (1996) ("A trustee may not mortgage trust property unless the trust agreement specifically authorizes such action without court approval."); *see also Chapman v. Williams*, 112 S.C. 402, 405–06, 100 S.E. 360, 361 (1919) ("This court does not say that under no circumstances will it allow trustees to put a mortgage on trust property, but three things must appear: (a) the necessity for the mortgage must be absolute; (b) the trustees must consent to the mortgage; and (c) the trustees must have the power to make the mortgage.").

Viewing the evidence in the light most favorable to the Diocese and the National Church, there is at least a genuine issue of material fact as to whether the Parish repudiated the trust. Thus, the circuit court erred by granting summary judgment to the Does on this issue. *See George*, 345 S.C. at 452, 548 S.E.2d at 874 ("The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder.").

### D. Laches

 The Diocese and the National Church argue the circuit court erred by granting summary judgment to the Does on the claim of laches. We agree.

---

**22.** *See* footnote 17, *supra*.

■ Laches is an equitable doctrine, which "arises upon the failure to assert a known right." *Ex parte Stokes*, 256 S.C. 260, 267, 182 S.E.2d 306, 309 (1971); *see Byars v. Cherokee County*, 237 S.C. 548, 559, 118 S.E.2d 324, 330 (1961) ("Laches is the neglect for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done, or neglecting or omitting to do what in law should have been done for an unreasonable and unexplained length of time and in circumstances which afforded opportunity for diligence.").

■ To prove laches, a party must establish: "(1) delay, (2) unreasonable delay, [and] (3) prejudice." *Hallums v. Hallums*, 296 S.C. 195, 199, 371 S.E.2d 525, 528 (1988); *see Arceneaux v. Arrington*, 284 S.C. 500, 503, 327 S.E.2d 357, 358 (Ct.App.1985) ("Whether . . . [a claim] is barred by laches is to be determined in light of the facts of each case, taking into consideration whether the delay has worked injury, prejudice, or disadvantage to the other party.").

■ In addition, "the circumstances must . . . [be] such as to import that the complainant had abandoned or surrendered the claim or right which he now asserts." *Byars*, 237 S.C. at 559, 118 S.E.2d at 330; *see Pendarvis*, 227 S.C. at 58, 86 S.E.2d at 744 (holding a party seeking to enforce a trust "may become barred by laches if he fails to proceed with reasonable diligence").

Assuming the trust still exists, no assertion of rights has been made on behalf of the trust in approximately 200 years. During this 200–year period, the Parish leased the property for uses not mentioned in the trust and mortgaged it on at least four different occasions.[23]

In the mortgages dated 1979, 1988, and 1993, the Parish covenanted it was "lawfully seised" of the property it was mortgaging. According to *Black's Law Dictionary*, "seise" means to hold in fee simple. *Black's Law Dictionary* 1362 (7th ed.1999). Thus, for approximately fifteen years, the Parish was specifically claiming to a third party that it held

---

23. This lawsuit was commenced in 2000. The Parish mortgaged the property for a fifth time in 2001.

the property in fee simple.[24] During this fifteen-year time period, the Does did not challenge the Parish's claim of ownership, even though a default on the mortgage could have resulted in foreclosure.

Prejudice is arguably shown because to allow the Does to assert ownership of the property after such a delay could cause the outstanding balances on the mortgages to come due immediately. *See Arceneaux*, 284 S.C. at 503, 327 S.E.2d at 358 (holding a claim is barred by laches if the delay prejudices the other party).

Viewing the evidence in the light most favorable to the Diocese and the National Church, there is at least a genuine issue of material fact as to whether the Does' claims are barred by laches. Thus, the circuit court erred by granting summary judgment in favor of the Does on the issue of laches. *See George*, 345 S.C. at 452, 548 S.E.2d at 874 ("The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder.").

### E. Staleness

■ The Diocese and the National Church argue the circuit court erred by granting summary judgment to the Does on the claim of staleness. We agree.

■ A stale demand is " 'one that has for a long time remained unasserted; one that is first asserted after an unexplained delay of such great length as to render it difficult or impossible for the court to ascertain the truth of the matters in controversy and to do justice between the parties, or as to create a presumption against the existence or validity of the claim, or a presumption that it has been abandoned or satisfied.' " *Pendarvis*, 227 S.C. at 59, 86 S.E.2d at 744 (quoting *Bell v. Mackey*, 191 S.C. 105, 123, 3 S.E.2d 816, 824 (1939)).

We find *Pendarvis* instructive on this issue. In *Pendarvis*, a trust was established in 1713. *Pendarvis*, 227 S.C. at 53, 86 S.E.2d at 741. The deed was recorded in the Register of Deeds Office for Charleston County within twenty years of the creation of the trust. *Id.* at 56, 86 S.E.2d at 742. However,

---

**24.** *See* footnote 17, *supra*.

the existence of the trust was forgotten for the next 200 years. *Id.* During this time period, the church treated the property as its own. *Id.* at 52–56, 86 S.E.2d at 741–43. Because no successor trustees were appointed after the original trustees died, no one representing the trust asserted ownership of the property pursuant to the terms of the trust during this 200–year period. *Id.* at 54, 86 S.E.2d at 742. When the church decided to subdivide the property in 1945, the trust was rediscovered and a suit was commenced to clear title to the property. *Id.* at 56, 86 S.E.2d at 742. In explaining numerous reasons not to enforce the trust, our supreme court reviewed these facts and then stated a court "should not now undertake to enforce this ancient trust." *Id.* at 57, 86 S.E.2d at 743.

Similarly, in the present case, a trust established in 1745 was recorded in the Register of Deeds Office for Charleston County approximately twenty years after the trust's creation. The trust was then forgotten for the next 200 years, during which time the Parish treated the property as its own. No successor trustees were appointed after the original trustees died, and thus, no one representing the trust asserted any ownership rights to the property during this 200–year period. The trust was rediscovered in 1986 and still no claim was made by the descendants of the trustees for another twenty years. It was not until the Diocese gave notice to the Register of Deeds Office for Georgetown County that both the Diocese and the National Church held an interest in the property that a lawsuit was filed in which the Does eventually asserted a claim to the property.

Viewing the evidence in the light most favorable to the Diocese and the National Church, there is at least a genuine issue of material fact as whether the Does' claims were stale.[25]

---

**25.** The dispute between the parties concerning the term "inhabitants on Waccamaw Neck" in the present case exemplifies why it is "difficult or impossible for the court to ascertain the truth of the matters in controversy and to do justice between the parties." *Pendarvis,* 227 S.C. at 59, 86 S.E.2d at 744. The Parish claims this term should be read according to its plain meaning. The Diocese and the National Church contend the term had a special meaning in colonial times and referred to the political unit that would exist once a parish was established. In attempting to ascertain the intent of the settlor, we note the extreme

*See id.* at 59, 86 S.E.2d at 744. Thus, the circuit court erred by granting summary judgment in favor of the Does on the staleness claim. *See George,* 345 S.C. at 452, 548 S.E.2d at 874 ("The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder.").

## III. Subject Matter Jurisdiction

### Standard of Review

▇▇▇ "Lack of subject matter jurisdiction can be raised at any time, can be raised for the first time on appeal, and can be raised *sua sponte* by the court." *Lake v. Reeder Constr. Co.,* 330 S.C. 242, 248, 498 S.E.2d 650, 653 (Ct.App.1998); *see Eaddy v. Eaddy,* 283 S.C. 582, 584, 324 S.E.2d 70, 72 (1984) ("[S]ubject matter jurisdiction ... may be raised at any stage of the proceeding.").

### A. Ascertaining Beneficiaries

▇▇▇ The Diocese and the National Church argue the circuit court lacked subject matter jurisdiction to declare the Diocese and the National Church to be incidental beneficiaries of the trust. To the extent the circuit court order does this, we agree and vacate.

The probate court has exclusive jurisdiction to "ascertain beneficiaries." S.C.Code Ann. § 62-7-201(a)(3) (Supp.2002). A beneficiary "includ[es] a person who has any present or future interest, vested or contingent ... and, as it relates to a charitable trust, includes any person entitled to enforce the trust." S.C.Code Ann. § 62-1-201(2) (1987).

The circuit court found the Diocese and the National Church were "at best, incidental beneficiaries" to the trust. To the extent that the circuit court's statement was a finding that the Diocese and the National Church were incidental beneficiaries, we vacate.

---

difficulty in determining which of these meanings would have been more prevalent in colonial times.

## B. Personal Property

 The Diocese and the National Church argue the circuit court erred by declaring it did not have subject matter jurisdiction to determine the ownership of the personal property. We agree.

"[T]he probate court has exclusive jurisdiction of proceedings initiated by interested parties concerning the internal affairs of trusts." S.C.Code Ann. § 62–7–201 (Supp.2002).

In its complaint, the Parish sought a declaration that it owned the personal property located on the real property. The Diocese and the National Church counterclaimed for a declaration that all personal property located on the real property was owned by the Parish, subject to an interest held by both the Diocese and the National Church.

After the circuit court determined the holders of both legal and equitable title to the real property, the circuit court stated it had "no further jurisdiction regarding this case." In the Rule 59(e), South Carolina Rules of Civil Procedure, motions to alter or amend the judgment, the Diocese and the National Church noted the issue of personal property had not been resolved. The circuit court did not address this issue in its order denying the motion.

The language of the trust deed refers only to real property.[26] Thus, because the personal property is not subject to the trust, the probate court cannot have exclusive jurisdiction over the personal property. Accordingly, we remand this issue to the circuit court.

## CONCLUSION

Based on the foregoing, the circuit court's order is

**VACATED IN PART, REVERSED IN PART and RE-MANDED.**

STILWELL and KITTREDGE, JJ., concur.

---

26. In their brief, the Does concede the personal property is not subject to the trust.